No. 12,322.

JOHNSON-OLMSTED REALTY CO. *v.* CITY AND COUNTY OF
DENVER ET AL.

(1 P. [2d] 928)

Decided June 29, 1931.

Mr. CARLE WHITEHEAD, Mr. ALBERT L. VOGL, Mr. FLOYD
F. MILES, for plaintiff in error.

Mr. THOMAS H. GIBSON, Mr. KARL BRAUNS, Mr. CHARLES
H. HAINES, Messrs. GABRIEL, MILLS & MILLS, for defend-
ants in error.

*En Banc.*

MR. JUSTICE HILLIARD delivered the opinion of the
court.

From a judgment dismissing its complaint, in which an injunction to restrain the carrying out of a contract was sought, the plaintiff brings error. The parties will be referred to as in the trial court, by title, or, where necessary to distinguish between the defendants generally the Allied Architects Association will be called the association and the City and County of Denver and its officers the city.

It appears from the complaint and answers and from the stipulation of facts upon which the cause was tried, that in November, 1924, the city, in presumed pursuance of the provisions of its charter and an ordinance (No. 207, Series of 1924), entered into a contract with the association to (a) prepare preliminary plans and estimates of costs for a municipal building and court house, (b) to prepare all plans and perform all services necessary and required in order that bids might be received and the contract or contracts let by the city for the construction of said building, and (c) to perform all services necessary and required fully to inspect and supervise all construction in accordance with the contract or contracts entered into under (b) for the erection of the complete building. The plaintiff asserts the invalidity of the contract upon several grounds, but these may be summarized as (1) that the contract was not let in accordance with the provisions of the city's charter, and (2) that the association was not competent, being a corporation, to practice architecture.

The pertinent sections of the charter (as printed in Denver Municipal Code, 1927) are as follows:

"Sec. 14. There shall be, and hereby is, created a department of improvements and parks, which shall have full charge and control of all public improvements and works heretofore under the board of public works and the commission of improvements * * *. The Manager of Improvements and Parks shall be the officer in full charge and control of said department.

"Sec. 15. General Powers and Duties as to Public Im-

provements: * * * the board of public works shall have exclusive management and control of * * * the construction of all buildings for the City and County except buildings used exclusively for fire or police purposes or for hospitals.

"Sec. 19. The board shall have full, complete authority * * * to expend on behalf of the city and county all appropriations made from the general revenues for the construction of public or local improvements.

"Sec. 28. All contracts for local improvements, and all other contracts involving expenditures under the direction of the board, shall be let by the mayor, upon recommendation of the board, without any action of the council, except in the passage of the original ordinance authorizing the improvement or contracts. All such contracts shall be let to the lowest reliable and responsible bidder, after public advertisement by the board for not less than ten days in some newspaper of general circulation, published in the city and county. Any other mode of letting such contracts shall be illegal and void and no contract shall be made without a bond for its faithful performance, with sufficient surety or sureties, to be approved by the board, and no other surety than a surety company, approved by the board and mayor, shall be accepted."

The association is a corporation, organized under the provisions of sections 2413-2417, C. L. '21, relating to cooperative associations. The only feature which distinguishes it from ordinary business corporations is certain restrictions upon membership and participation in profits. The articles are dated, or were subscribed, on June 2, 1924, and were filed on November 21, 1924, in the office of the secretary of state. The purposes of the association are stated to be, in general terms, the advancement of the art of architecture; to secure, by professional cooperation and collaboration of all its members, for municipalities, counties and governments the highest expression of the art of architecture in the designing and

construction of public buildings and improvements; to secure for the benefit of its members the assistance of competent and skillful architects, draftsmen, engineers, etc.; to erect a building for its own purposes; to borrow money, and to do generally anything of like kind. No restrictions as to membership are found in the articles and only by implication in the by-laws is membership limited to licensed architects. So far as the articles are concerned, therefore, the association is no different than any business corporation and it might, in the process of its development, become entirely owned and controlled by persons other than architects. So far as the by-laws are concerned it may be that only licensed architects are to be received as members, but obviously these may be amended at any time to permit the reception of other persons. By the stipulation of facts it is agreed that at the time of the execution of the contract all of the members of the association were licensed architects, but that the association itself was not licensed.

At the outset it will be well to determine the right of the plaintiff to maintain its action, for the city has vigorously asserted that it had no such right. The primary purpose of the action was to restrain, as unlawful, the payment by the city and its officers of any money to the association. It is admitted that the plaintiff is a taxpayer, and, such being the fact, we entertain no doubt that it had the right to sue to restrain the payment of funds to which it had been and would be obliged to contribute to persons not lawfully entitled to receive the same. Certainly, if the contract contravened the terms of section 28 of the charter the suit was proper, and it would also seem that if the association could not lawfully enter into the contract because of defects inherent in itself, at least further payments to it should be restrained. *Leckenby v. Post Co.,* 65 Colo. 443, 176 Pac. 490; *Elkins v. Milliken,* 80 Colo. 135, 249 Pac. 655; *Denver v. Pitcher,* 54 Colo. 203, 129 Pac. 1015.

The circumstances leading up to the making of the con-

tract between the city and the association may furnish some light upon our inquiry. The complaint charges that the association was formed for the sole purpose of entering into the contract and some basis for this is to be found in the association's by-laws, for these, unlike its broad articles, limit the activities, or "paramount purpose" as it is therein termed, "to secure for and to provide the County and City of Denver with the highest and best expression of the profession of architecture, in the design and construction of the proposed city hall and court house building. No other commission or employment may be undertaken by the association without an approval vote first being had from the membership. * * *." The complaint further charges that the purpose of organizing the association was to stifle and prevent competition in the matter of the services contracted to be furnished. The stipulation of facts admits that prior to November 21, 1924, the date of the filing of the articles of incorporation, the defendant mayor met and tentatively agreed with a number of Denver architects that the association should be formed and that it should be the architect for the proposed municipal building. Whether or not it was agreed what compensation should be paid does not appear, but the ordinance above referred to recites in full a contract which the council, whether in proper exercise of its powers or not it is unnecessary to determine, authorized the mayor and clerk to subscribe in behalf of the city. This ordinance was introduced immediately after the incorporation of the association, passed by the council on December 1, 1924, and approved by the mayor on December 3, 1924. By its terms the association was to receive for the services mentioned in (a) above, two-fifths of six per cent of the total cost of the building, for (b) two-fifths, and for (c) one-fifth, with provision for additional compensation of cost plus ten per cent for services required by the city because of changes in plans or the like.

We shall not presume to place a construction on the

acts so charged and those admitted to have been done, except to say that we cannot, in view of our belief that the contract was unlawful and illegally entered into, approve such methods of conducting the business of municipalities.

██ The argument of the association and of the city is, of course, that the city may contract for the services of an architect without complying with the requirement that bids must be called for before a contract can be entered into, and this view was adopted by the court below. In his opinion the learned trial judge finds that it was not "possible or practicable to make such a preliminary contract the subject of general competition." No reason for this statement appears and we are doubtful if it be entirely sound, for very frequently competitions are entered into by architects to make designs and plans for municipal and other public buildings, and we know of no rule that would prevent such architects offering supervisory services at rates less than those agreed upon between the city and the association here. Neither does the statement take into consideration the words "reliable" and "responsible" used in section 28, for it would seem that if proper significance be given those words it would be entirely possible for the city to obtain the very finest of architectural service upon bids. Further inquiry into this phase is, however, unnecessary, for, as will appear, the reason for the rule is not present, and hence the rule must fail also. As was well said by Mr. Justice Butler in *Roll v. Davis,* 85 Colo. 594, 277 Pac. 767, "As in the circumstances presented by the record, the reason for the rule invoked by counsel is absent, the rule itself, if it ever had any existence in this state, would not apply to this case."

The reason for the rule that an exception in favor of architects must be read into the plain language of section 28 is, counsel say, that competitive bidding statutes cannot be rationally applied to contracts for the employment of architects because the value of such services de-

pends not upon the amount of money to be paid but upon the selection of the person by the exercise of a wise and unhampered discretion in the one seeking such services, for the qualities of reputation and personal and professional trustworthiness are paramount.

Has that rule application here, even if we were to adopt it? We think not, for in the case at bar the very elements so much to be desired in the person employed are not found. The city did not employ one or two or any number of architects; it employed a corporation itself not licensed. True, some apparently very able architects are members of the association and are said by counsel to have been or are engaged in the present construction of the building, but how long they were or will be is a matter not in the hands of the city but in the hands of the association. Without let or hindrance from the city the most incompetent of architects may tomorrow be admitted to membership in the association and the next day be the sole arbiter of the completion of the building. He may indeed be the very architect who would have made the lowest bid if bids had been taken (excluding from consideration the words ''reliable'' and ''responsible'') and the very person, therefore, to prevent whose competition it was determined that bids should not be had and the rule invoked which is above set forth. It seems to us too plain for argument that the city has signally failed to exercise wise and unhampered discretion in seeking such services for the qualities of reputation and personal and professional trustworthiness may disappear, and not through failure in that regard on the part of the gentlemen with whom the city originally contracted, but through the absence of such qualities in those of whom the membership of the association may at a given time be composed. We are not unmindful, in this respect, that the contract provides that the personnel of the association's directors, officers, advisory architect, and chairmen of the principal committees shall not be changed without the consent of the mayor, but there is nowhere to be

found any provision that those men are to perform the contract or have anything to do with it, or is there anything to prevent the resignation of any of them. The vice of the contract is that instead of the city naming the architects who shall design and construct its building, it has agreed that the association shall name them.

A decision (A-28907) of the Comptroller General of the United States given on October 28, 1929, to the Commissioners of the District of Columbia discloses a similar situation and is an admirable expression of our own views. The question was whether, under section 3709, Revised Statutes of the United States, the commissioners might, without advertising, enter into a contract with the Allied Architects, Inc., for architectural and professional services.

Section 3709 provides that: "All purchases and contracts for supplies or services in any of the departments of the Government * * * except for personal services, shall be made by advertising a sufficient time previously for proposals respecting the same, when the public exigencies do not require the immediate delivery of the articles, or performance of the service. * * *"

The articles and by-laws of the Allied Architects, Inc., are very similar to those of the association. The comptroller said:

"It is not questioned that a corporation may contract for a character of services that may be classed as personal, but that does not bring the corporation within a character of personal service contracting that is the exception to the requirements of section 3709 of the Revised Statutes for contracting without advertising. Chief Justice Marshall, in the famous Dartmouth College Case, 4 Wheaton, 518, said that: 'A corporation is an artificial being, invisible, intangible, and existing only in contemplation of the law. Being the mere creature of the law, it possesses only such properties which the charter of its creation confers upon it, either expressly or as incidental to its very existence.' That is to say, the corporation is

258

a separate and distinct legal entity from its shareholders. United States v. Strang, 254 U. S. 491. Clearly the type of personal service authorized by section 3709, Revised Statutes, to be employed without advertising, is the services of individuals as such and with direct personal responsibility, and it appears equally clear that the type of service The Allied Architects (Inc.)—'an artificial being, invisible, intangible, and existing only in contemplation of law'—is organized to render is not such service. Whatever personal service may enter into the product of The Allied Architects (Inc.), is rendered through the mediatory of the corporation and not directly by the corporation as such.

"However, it is noted that in the form of contract tendered by the corporation, it is proposed to pledge itself to furnish the services of three architects named therein. The naming of particular architects whom the corporation will select to perform the services, does not bind them as individuals nor make the contract other than that of the corporation—otherwise the contract would come to nothing more than agreeing the corporation may name the architects instead of the commissioners selecting them. And so, also, if it be urged that the commissioners are selecting and employing architects, then the contract with the corporation as an intermediary is unnecessary. Furthermore, there has been submitted nothing to show authority in the corporation to pledge the services of such architects—even though they be stockholders of the corporation. But even if it be considered that the fact the architects are stockholders in the corporation confers on the corporation, under the by-laws, the authority to so pledge and bind the architects in question, nothing would be gained by such an indirect route to accomplish what appears desired by the commissioners—the personal services of the particular architects named in the proposed contract and, as stated, the contracting with the corporation as an intermediary would serve no useful purpose.

"It may be stated further that section 3709, Revised Statutes, originated in the act of March 2, 1861, 12 Stat. 220, at a time in the development of corporate history when the organization of a corporation by architects through which to pool their individual training, experience and skill was unknown to the law. The personal services referred to in said section to be obtained without advertising are services rendered by an individual directly to the Government, which services are to be obtained under the subsequent civil service laws and in accordance with the classification act, except where specific authority is granted, as in the public resolution approved June 15, 1929, to secure the services otherwise. See 15 Op. Atty. Gen. 538; 6 Comp. Gen. 259; 9 id. 67. Section 3709, Revised Statutes, permits contracting without advertising with a person who is to render the personal service, but it does not permit contracting without advertising with an intermediary corporation such as The Allied Architects (Inc.), which in turn is to secure the services of individuals to render through the corporation such personal service as is in question here." 9 Comp. Gen. 169.

As will be observed, the contract is divided into three parts. The one above designated as (c) requires the association to "perform all services necessary and required to fully inspect and supervise all construction in accordance with the contract or contracts entered into under (b) for the erection of the complete building." The plaintiff urges that this clause calls only for the services of a superintendent of construction and that such services must be obtained by bid. The defendants assert that as a matter of fact a great deal of professional skill enters into the services contemplated by that clause and quote from the contract entered into with the company that is engaged in construction of the building. We have examined that contract and it seems to us that the services there mentioned are properly a part of (a) and (b) and not of (c). That being our view, the case of *Colorado*

260

*Springs v. Coray,* 25 Colo. App. 460, 139 Pac. 1031, is in point. That was a suit on a quantum meruit to recover the value of services as superintendent of construction of a city hall, and the act involved was section 16, page 383, Laws 1891. That section provided that: ''All work done by the city in the construction of works of public improvement of every kind shall be done by contract [let] to the lowest responsible bidder, upon open bids, after ample advertisement.'' The Court of Appeals held that the act required bids for such services and that the employment of the superintendent having been made without bids was void. At page 475 the court said: ''There is no apparent necessity for exempting superintendents of construction from the statutory rule. It is a matter of common knowledge among people who deal in such matters that architects and engineers of unquestioned ability and high reputation frequently, if not usually, offer their services as superintendents of construction—upon a percentage of the contract price, or upon some other basis.''

And it will be observed that as in section 28 of the Denver Charter, so in the act of 1891, the word ''responsible'' occurs, which modifies the effect of the word ''lowest'' and allows the exercise of that discretion thought to be so desirable in the securing of the services of architects and superintendents.

If it still be urged, however, that architectural services are to be included under (c), then the answer is to be found in *Dalby v. Longmont,* 81 Colo. 271, 256 Pac. 310, Dalby was employed to superintend the finishing of a reservoir, he to furnish his own machinery and tools. The contract with him was rescinded, and the question was whether his employment was valid. At the time the contract was entered into chapter 236, Laws 1921, providing that in works of public improvement, cities shall not be required to obtain bids for technical and professional assistance, etc., was in effect, but this court held that the

contract was invalid by reason of the lack of bids because Dalby's work "at least was not wholly technical or professional, because he was to employ and did employ his own machinery and tools and was to be and was supervised by city officials." Applied to the facts here that rule seems salutary, for it would be an easy matter else to evade the charter by the simple means of introducing a small item of professional service into a contract otherwise requiring the obtaining of bids. And so far as the question of supervision by city officials is concerned, it is to be noted that here in the plans and specifications furnished to bidders on the contract to construct the building it was specifically set forth that: "It is understood and agreed that the exclusive management and control of the construction of said building is, by the Charter of the City and County of Denver, expressly vested in the Manager of Improvements and Parks, and that thereunder all orders, certificates, plans and specifications are subject to and dependent upon his approval, for their validity."

That the contract falls within the doctrine of *Colorado Springs v. Coray, supra,* is made clearer by quoting from one of its provisions. Article IV is as follows:

"The Architects shall fully supervise the construction of said building, and will, to the best of their ability, safeguard the Owner against defects and deficiencies in materials and work and against non-compliance by any contractor with the terms of the contract.

"The Architects agree to employ, and to assume the expense of such employment, a competent building superintendent, who shall work under the direction of the Architects and who shall give constant supervision to all work under construction in the building. The employment of said building superintendent shall be made subject to the approval of the Mayor of the City and County of Denver, and the said Mayor shall have the power of dismissal of said building superintendent, in which event The Architects shall immediately employ, subject to the

approval of the said Mayor, another building superintendent, whose duties shall be those above mentioned, and in the event they should fail to make said appointment for a period of not to exceed five (5) days, said appointment shall be made by the Mayor, at the expense of The Architects, which they hereby assume and agree to pay; and The Architects will not be relieved of any responsibility by the Mayor making this appointment.''

From this it will be seen that the services of a ''competent building superintendent,'' not necessarily an architect, is to be furnished, and thus, for two reasons, the contract is bad. First, for the reasons upon which the Comptroller General based his conclusions and which we approve, and, second, because in any event competitive bids for such service must be had.

It is our conclusion, upon this phase, that (c) plainly contemplates services for which bids must be received under the charter.

■ We turn now to the question of the right of the association to engage in the practice of architecture at all. The provisions of the statutes (sections 4679-4695) governing architects are not free from ambiguity. It is argued that because, in section 4692, it is provided that ''Any person, firm or corporation who shall be engaged in the planning or supervision of the erection * * * of buildings for others * * * shall be regarded as an architect * * *,'' and that because, in section 4691, as amended, it is provided that a fine shall be imposed upon any person, firm or corporation practicing architecture without a license, that the legislature has given its approval to the practice of architecture by corporations. But we are not of opinion that any such result necessarily follows, for other sections, relating to qualifications and examinations, necessarily exclude such a notion. We do not wish to be thought to say that the legislature may not permit the granting of licenses to corporations, but to say that we are of opinion it has not done so. But counsel for defendants say that in the first place all the mem-

bers of the association are licensed and that in the second place the association is really a partnership. The answer to the latter assertion is that the association is a corporation by the voluntary choice of its organizers. The answer to the first assertion is to be found in our decision in *People v. Painless Parker Dentist,* 85 Colo. 304, 275 Pac. 928, where at page 313 Mr. Justice Campbell said: "It is, however, altogether clear that the inhibitions of the statute against the practice of dentistry in this state are applicable not only to natural persons, but it applies as well to an artificial person or a corporation, because, in the very nature of things, the corporation cannot meet the conditions upon which the right to a license depends and no one, whether an ordinary person or an artificial being, is entitled to practice unless, among other requirements, he first secures a license from our state board of dental examiners. The many other arguments and suggestions of defendant's counsel need not be considered. It would be a strange result to reach for a court to hold that because a private corporation cannot pass an examination and furnish a good moral character, therefore, it is not within the inhibition of the statute and may freely and without restriction engage in the practice of dentistry in this state without a license, whereas a citizen of the state, a human being, may not possess or acquire the right to practice dentistry in this state unless he first procures a license therefor. The statute is broad enough to include both a human being or an artificial being, a private corporation."

We hold, therefore, that the association, actually unlicensed, is, as the law now is, incapable of becoming a licensed architect, and was incompetent to contract to furnish architectural services.

For the foregoing reasons the judgment is reversed and the cause remanded with instructions to proceed in harmony with the views here expressed.

Mr. Justice Butler dissents.

Mr. Justice Butler, dissenting.

I cannot agree with my brethren in holding that the provision relating to competitive bids applies to the contract in question, and that an incorporated cooperative association cannot lawfully engage in the practice of architecture in this state.

1. The provision concerning competitive bids does not apply to the employment of architects, civil engineers, superintendents or inspectors of building construction, or others possessing professional skill, scientific knowledge or technical learning. As was said in *Gulf Bitulithic Company v. Nueces County* (Tex. Civ. App.), 297 S. W. 747, 754: "The value of such services is not to be measured by a mere matching of dollars, so to speak; it is not to be determined upon the irrational assumption that all men in the particular class are equally endowed with technical or professional skill, knowledge, training, and efficiency, nor are such services rendered more desirable because offered more cheaply in a competitive bidding contest. The selection of a person to perform services requiring those attributes calls for the exercise of a wise and unhampered discretion in one seeking such services, for it involves not only those attributes, but the qualities of reputation and personal and professional trustworthiness and responsibility as well." And with specific reference to architects, we find in *Miller v. Boyle,* 43 Cal. App. 39, 44, 184 Pac. 421, this quotation from the opinion in another case: "An architect is an artist. His work requires taste, skill, and technical learning and ability of a rare kind. Advertising might bring many bids, but it is beyond peradventure that the lowest bidder might be the least capable and most inexperienced, and absolutely unacceptable. As well advertise for a lawyer, or civil engineer for the city, and intrust its vast affairs and important interests to the one who would work for the least money."

On the subject generally, see 3 McQuillin, Municipal

Corporations (2d Ed.) §1292; 2 Dillon, Municipal Corporations (5th Ed.) §802; *Tackett v. Middleton* (Tex. Com. App.) 280 S. W. 563, annotated in 44 A. L. R. 1143, 1150; *Hibbs v. Arensberg,* 276 Pa. 24, 119 Atl. 727.

2. But it is said, in effect, that the service specified in (c) of the contract is superintendence, and that whatever may be said as to the other provisions, the contract, so far as it relates to superintendence, is void.

In Colorado Springs v. Coray, 25 Colo. App. 460, 139 Pac. 1031, cited in the majority opinion, three of the judges thought that the Coray contract came within the terms of the statute concerning competitive bids, whereas two of the judges took the opposite view. In his opinion, Judge Hurlbut said: "I agree with the court in reversal of the judgment, and with its reasoning generally, except that part which holds that the statute quoted, sec. 6579, Revised Statutes, 1908, is applicable in this case to appellee. * * * I think this character of service is necessarily one requiring skill, experience and special knowledge, and brings the one performing it within the category of engineers, architects, surveyors, attorneys, etc. I am convinced that the legislature, in passing the statute, did not contemplate as coming within its provisions, as to competitive bidding after advertisement, any person employed by the city to render services calling for special skill, knowledge or experience. New York, Texas and Virginia have on this subject statutes somewhat similar to our own. The appellate courts of New York and Texas, and the federal court of Virginia, have all held that the statute does not apply to engineers, superintendents, etc. I fail to find where an appellate court of any state has directly passed upon and construed a statute similar to our own, contrary to the cases mentioned: *City of Newport News v. Potter,* 122 Fed. 321, 58 C. C. A. 483; *City of Houston v. Glover,* 40 Tex. Civ. App. 177, 89 S. W. 425; *City of Houston v. Potter,* 41 Tex. Civ. App. 381, 91 S. W. 389; *Horgan & Slattery v. City of New York,*

114 App. Div. 555, 100 N. Y. Supp. 68.'' And Judge Bell thus expressed his views: ''I concur in the conclusion of my associates, that the judgment of the trial court shall be reversed, but prefer to base my concurrence on errors committed by the trial court in giving instruction number 2, * * *. It is my opinion that the legislature did not intend, by the enactment of sec. 6579, Revised Statutes of 1908, that a municipality should advertise for and reecive bids for such technical, professional or incidental assistance as it may deem wise to employ in guarding the interest of the city against the neglect of contractors in the performance of their undertakings.'' In the majority opinion there is this important statement that differentiates the Coray case from the present one: ''It is not claimed that plaintiff was an engineer or architect, or possessed technical skill not possessed by other experienced contractors and builders.'' In the present case, on the contrary, the superintendence provided for is by architects—skilled, technical, professional service. The decision in the Coray case, therefore, does not apply to the facts in this case; but were it otherwise, even a unanimous decision of the Court of Appeals would not be controlling here.

That superintendence of construction work belongs to the technical or professional class necessarily excepted from the operation of the provision concerning bids, was recognized by this court in *Dalby v. Longmont,* 81 Colo. 271, 256 Pac. 310, cited in the majority opinion. The resolution provided that Dalby be employed ''to superintend the finishing of the new reservoir, furnish his own machinery and tools, and that the work be carried on under the supervision of Mr. Bice, city engineer, Mr. Dalby and Mr. Shumaker.'' He was to be paid the lump sum of $2,500 for both his services and the use of the equipment. The contract was let to Dalby without bids. We said: ''Dalby's work was not, at least was not wholly, technical or professional because he was to employ and did employ his own machinery and tools and was to be

and was supervised by city officials.'' We therefore held the contract to be invalid. The implication is that if the contract had been for superintendence only, the provision concerning bids would have no application. And see 3 McQuillin, Municipal Corporations (2d Ed.) §1292, where the author cites cases to the proposition that such a provision does not apply' to contracts for the service of ''a superintendent or architect to supervise and make suggestions relative to work let under competitive bidding.'' In the present case the contract for the construction of the building was let under competitive bidding. So also in 44 A. L. R. 1156, note, it is said: ''A municipality may engage a civil engineer to prepare plans for and supervise the construction of a public improvement without first calling for bids, as this is a service calling for special skill to which a provision as to letting contracts on bids is inapplicable.'' And in *Hunter v. Whiteaker* (Tex. Civ. App.) 230 S. W. 1096, the same statement is made with reference to the employment of a civil engineer to plan and supervise the construction of roads. Indeed, our Architects Act provides that one engaged in the planning ''or supervision'' of the erection of buildings for others ''shall be regarded as an architect.'' C. L. §4692.

This case is not one involving services of a mere superintendent who is not an architect and who does not possess technical skill beyond that of experienced contractors and builders. The association was organized by a group of licensed architects, one of the purposes being, to quote from the articles of incorporation, ''By the professional cooperation and collaboration of all its members to secure for, and to provide municipal, county, state and national governments with the highest and best expression of the art of architecture in the design *and construction* of public buildings, structures and improvements.'' The contract contemplated that the combined artistic skill of that group should be exercised, not only in the preparation of the plans and specifications, but

also in the inspection, supervision and superintendence of the construction of the building, a building expected to cost several million dollars. Thus, the construction contract provides that the association shall furnish additional instructions, by drawings or otherwise; that as the work progresses the contractor shall submit copies of all shop or setting drawings and schedules to be passed upon by the association; and that the contractor shall provide full size plaster models of all ornamental carved and molded granite, lava stone, terra cotta, or other building stones, said models to be set up at the location and height at which they appear in the building, for the inspection and approval of the association, and if not approved they shall be remade until finally approved.

3. I cannot agree that the reason for the exception in cases of contracts for technical, professional and artistic services is not present in this case. The city, in the exercise of a free, unhampered choice, selected, in preference to one architect, an association of architects of ability, organized, as we have seen, to advance the art of architecture, to secure, by professional cooperation and collaboration of *all* its members, for municipalities, counties and governments the highest expression of the art of architecture in the designing and construction of public buildings and improvements; and, specifically, to render such service for the city of Denver. The city had confidence in the artistic skill, and in the ability and trustworthiness of the association, just as persons have confidence in certain incorporated banks, insurance companies and industries, because of confidence in those who conduct their affairs. In the present case the city took ample precaution to secure the continuance of the present officers, directors, advisory architect and chairmen of the principal committees, and the building superintendent, who is to work under the direction of the association. Changes in the personnel can be made only with the consent of the mayor.

4. The court holds that corporations cannot practice

architecture. That position does not impress me as sound.

The association was incorporated under the Co-operative Association Act of 1913. Section 2 of that act (C. L. §2414) permits the incorporation of such associations "for the co-operative transaction of any lawful business." Architecture, of course, is a lawful business. Like all other lawful kinds of business, it is subject to reasonable regulation under the police power.

Section 4692, C. L., provides that: "Any * * * corporation * * * engaged in the planning or supervision of the erection * * * of buildings for others * * * shall be regarded as an architect within the provisions of this act, and shall be held to comply with the same." Amended section 4691, C. L., forbids any person, firm or corporation to practice architecture without a license. This indicates that it was contemplated that corporations may be licensed to practice architecture. If it were otherwise, the statute would have forbidden any person or firm from practicing architecture without a license, and would have forbidden corporations from practicing architecture at all. Section 4682, C. L., empowers the board of examiners to adopt all necessary rules, regulations and by-laws to govern its proceedings, not inconsistent with the law. Section 4686, C. L., provides that: "The board shall adopt rules and regulations for the examination and registration of applicants * * *." It is stipulated that the board adopted, among other rules and regulations, one to the effect that the board "do hereby approve and recognize as architects and empower to practice as architects all * * * companies or associations incorporated as architects, when each and every member are bona fide licensed and registered architects." It is stipulated that each and every member of the Allied Architects Association is a bona fide licensed and registered architect. Of course, there was not issued a paper, entitled "License," certifying that the association had passed satisfactorily an examination, and therefore was entitled to practice

architecture. We must assume that that is what was meant by the statement, in the same stipulation that set forth the above regulation, that ''no license to practice architecture has ever been issued to the corporation.'' We must so construe the provisions of the statute referred to above as to make them harmonize, if possible. It cannot be assumed that when the Legislature, in the Architects Act, expressly mentioned corporations in the manner above stated, it meant nothing by the words used. Some effect must be given to them.

The law permits incorporated co-operative associations to engage in any lawful business. It contemplates the practice of architecture by corporations, and the licensing of corporations for that purpose, and forbids them to practice without being licensed. We cannot assume that the Legislature intended to impose conditions impossible of performance, for that would be, not the regulation, but the prohibition, of a perfectly lawful occupation, and therefore an unconstitutional exercise of the police power. It is obvious, therefore, that an examination of a corporation, being impossible, is not, and cannot be, required; and that it was not intended that a license, using the word in the sense of a certificate that an applicant has satisfactorily passed an examination and therefore is licensed to practice, should be issued in the case of a corporation. *Binford v. Boyd,* 178 Cal. 458, 174 Pac. 56. Some other way of satisfying the board of examiners that the public will receive the protection to which it is entitled should be sufficient. The board, pursuant to the authority vested in it, adopted a regulation that fully meets the requirements. It should be held that there was a substantial compliance with the law, and that, within the meaning of the law, the association was duly licensed to practice architecture. Indeed, it may be that the requirements of the board went farther than was necessary. If the Legislature had expressly forbidden corporations to practice architecture unless all of the members were licensed architects, it probably would be

held to be an unconstitutional exercise of the police power. *Liggett Drug Co. v. Baldridge,* 278 U. S. 105, 49 Sup. Ct. 57. How much more open to constitutional objection is the statute, as construed by the court in the present case, that absolutely bars a lawful corporation from engaging in a lawful occupation.

In the Liggett case, supra, a statute of Pennsylvania prohibited ownership of a pharmacy or drug store, or interests in corporations, partnerships or associations owning such stores, by other than licensed pharmacists. The court held that mere stock ownership in such a corporation can have no real or substantial relation to the public health so as to justify the exercise of the police power in the manner attempted by the statute, and that the statute was invalid as denying due process of law under the Fourteenth Amendment. After calling attention to other statutes of the state, the court said: "It, therefore, will be seen that without violating laws, the validity of which is conceded, the owner of a drug store, whether a registered pharmacist or not, cannot purchase or dispense impure or inferior medicines; he cannot, unless he be a licensed physician, prescribe for the sick; he cannot, unless he be a registered pharmacist, have charge of a drug store or compound a prescription. Thus, it would seem, every point at which the public health is likely to be injuriously affected by the act of the owner in buying, compounding, or selling drugs and medicines is amply safeguarded. The act under review does not deal with any of the things covered by the prior statutes above enumerated. It deals in terms only with *ownership.* It plainly forbids the exercise of an ordinary property right and, on its face, denies what the Constitution guarantees. A state cannot, "under the guise of protecting the public, arbitrarily interfere with private business or prohibit lawful occupations or impose unreasonable and unnecessary restrictions upon them,' " citing cases.

How much more remote is the relation between the practice of architecture by an incorporated association,

and the public health or safety! The public health and safety may lawfully be, and they are, amply protected by the elaborate provisions of the Building Code, and, if more were needed, by the provision that no one but a licensed architect can plan or supervise the' erection, enlargement or alteration of buildings for others.

A California statute established a board of architects, and empowered the board to examine applicants to practice and to issue licenses to those who pass such examinations. It made it a misdemeanor "for any person to practice architecture without a certificate in this state"; but provided that the act should not prevent any person from furnishing plans or other data "for buildings for other persons, provided the person so furnishing such plans or data shall fully inform the person for whom such plans or data are furnished that he, the person furnishing such plans, is not a certified architect." A corporation that was not a certified architect furnished building plans to the defendant, without informing the defendant that the corporation was not a certified architect. An assignee of the account sued the defendant for the services rendered. The court held that the act does not prevent a corporation from employing certified architects to prepare building plans and specifications and furnish them to others for compensation. A judgment for the plaintiff was affirmed. *Binford v. Boyd,* 178 Cal. 458, 174 Pac. 56.

The case of *People v. Painless Parker,* 85 Colo. 304, 275 Pac. 928, cited in the majority opinion as conclusive on this branch of the case, differs from the present case in important particulars. There are no provisions in the statute there involved similar to amended section 4691 and section 4692, C. L., supra, relating to architects, and the facts in the two cases and the controlling principles are different. In the Painless Parker case, distinguishing it from *Liggett Drug Co. v. Baldridge, supra,* Mr'. Justice Campbell, after calling attention to the conclusion in the Baldridge case that the "act in question cre-

ates an unreasonable and unnecessary restriction upon *private business,"* said, at page 312: "This clearly differentiates the applicable principles of law where restrictions are placed upon a private business, and where restrictions and regulations which are, as in the case now before us, as to matters that affect the public health like the practice of dentistry."

The construction given by the court in the present case brings the statute perilously near, if not actually over, the line separating the constitutional from the unconstitutional. Such construction should be avoided if the statute can reasonably be given a construction that will not raise a serious doubt as to its constitutionality. *U. S. v. Jin Fuey Moy,* 241 U. S. 394, 36 Sup. Ct. 658; *U. S. v. Delaware & Hudson Co.,* 213 U. S. 367, 29 Sup. Ct. 527. As we have seen, such a construction is neither necessary nor reasonable.

For the reasons stated herein, the judgment, it seems to me, should be affirmed.