## No. 17,369.

### McNichols, Auditor *v.* City and County of Denver et al.
(274 P. [2d] 317)

Decided September 20, 1954.

Mr. IVOR O. WINGREN, Mr. HENRY E. LUTZ, for plaintiff in error.

Mr. JOHN C. BANKS, Mr. HORACE N. HAWKINS, JR., for defendants in error.

*En Banc.*

MR. JUSTICE HOLLAND delivered the opinion of the Court.

AT a special election held on September 9, 1952, qualified electors of the City and County of Denver authorized the issuance of general obligation bonds in the amount of $350,000 to be used for the extension, improvement and the equipping of Juvenile Hall, which had been regularly submitted to such electors. Thereafter, the bonds were sold and the proceeds placed in the treasury of the City and County of Denver.

Thereafter the Manager of Improvements and Parks published a notice to architects in "The Daily Journal," calling their attention to the proposed construction work and requesting that architects who might be interested to file fee schedules, a statement of their professional qualifications and other information pertaining to the proposed work. A number of architects responded by submitting fee schedules and other information.

Thereafter, and on March 20, 1953, upon the recommendation and approval of the Manager of Improvements and Parks, and under the seal of the City, the Mayor entered into an employment contract with one Stanley E. Morse, one of the architects who submitted a fee schedule for the preparation of plans for the construction contemplated. Ten days thereafter, signed copies of the contract were delivered to William H.

McNichols for his counter signature and registration, as is necessary and required for compliance with the charter provisions relating to such contracts. The Auditor refused to countersign and register the contract and thereupon the City, on June 24, 1953, filed a complaint in the district court entitled, "To Compel an Officer to Perform an Act." The complaint contained two causes of action, the first being on the theory that it was mandatory upon the Auditor to approve any contract for architectural services entered into by the Mayor; alleging that the voters had authorized the bond issue; that the architectural contract therefor had been awarded; and the refusal of the Auditor to sign and register. The second cause of action alleged compliance with section 28 of the charter of the City and County of Denver, in that, the Mayor had advertised a notice to architects as hereinbefore set out; and that the contract had been awarded to the lowest reliable and responsible bidder for such services. Defendant Auditor answered the complaint, and as to the first cause of action incorporated a motion to dismiss on the ground that the alleged cause of action failed to state a claim upon which the relief prayed for could be granted. After argument this motion to dismiss the first cause of action was sustained against the City's contention that section 28 of the city charter related to construction contracts only and not to professional services. Defendant in answer to the second cause of action admitted the advertisement for bids and the awarding of the contract to Morse; alleged nonconformity with section 28 of the charter; and further alleged that the award to Morse "was arbitrary and capricious and constituted an intended partiality in favor of Morse." The answer also set out sections 28 and 139 of the charter, which are as follows:

"Sec. 28. All contracts for local improvements, and all other contracts involving expenditures under the direction of the board, shall be let by the mayor, upon recommendation of the Board, without any action of the

council, except in the passage of the original ordinance authorizing the improvement of contracts. All such contracts shall be let to the lowest reliable and responsible bidder, after public advertisement by the board for not less than ten days in some newspaper of general circulation, published in the city and county. Any other mode of letting such contracts shall be illegal and void and no contract shall be made without a bond for its faithful performance, with sufficient surety or sureties, to be approved by the board, and no other surety than a surety company, approved by the board and mayor, shall be accepted. * * *."

"Auditor

"139 General Duties.

"He shall * * * see * * * that no appropriation of funds is overdrawn or misapplied, and that no liability is incurred, money disbursed or the property of the city and county disposed of contrary to law or ordinance, and shall perform such other duties not inconsistent with the provisions of this charter, as the council may be ordinance require. * * *."

A partial stipulation of facts was entered into. The stipulation as to what had occurred, and which has hereinbefore generally been cited, is now of no particular consequence, except the stipulation that the Manager of Improvements and Parks duly advertised for bids; that ten architects responded, and the bids and amounts thereof are attached to the stipulation. These bids ranged from a low fee of 4½% to a high fee of 6% of the amount to be expended. Morse's bid was 5.95%.

The written recommendations of the Manager of Improvements and Parks is as follows:

*"Recommendations.*

"1. It would obviously take some time and a lot of study for any of these proposers, except Morse, to become sufficiently acquainted with this job to turn out thoroughly competent plans. If this work is rushed, or if mistakes occur, or for any other reason, the difference

in fees might be more than offset by added construction costs — some $4,500 is involved.

"2. While most of the proposers are competent and reputable, they have expressed ideas which are at variance with Gilliam's requirements; they might or might not be amenable to his ideas.

"3. Morse appears to be the 'lowest reliable and responsible bidder' in the sense that he is best qualified by his work with Gilliam during the past year."

After delivery of the contract to the Auditor, he refused to approved the contract on the ground that the requirements of section 28 of the charter had not been complied with.

At the time of the trial on January 12, 1954, the only witnesses were Manager Campbell and Mr. Morse for the plaintiff, and a stipulation as to what Mr. McNichols would testify on behalf of defendant was used, due to the fact that McNichols was ill at the time and not available as a witness. The essential part of McNichols' testimony would have been to the effect that Campbell, the Manager of Improvements and Parks, in a letter to one of the competitor bidders, had recognized that section 28 of the charter would have to be amended in order to obviate the effect of two decisions of the Supreme Court of Colorado relating to the awarding of architectural contracts in order that the awarding authorities would have a freer hand in such matters; further that he concluded that the awarding constituted an intentional and predetermined favoritism to Morse at the instance of the Judge of the juvenile court; and that the advertisement for competitive bids was a sham procedure violating the substance and spirit of section 28 of the charter.

At the conclusion of the trial the court took the matter of the second cause of action under advisement and later in a lengthy finding of fact and conclusion of law entered judgment for plaintiff City, which was a direction to the Auditor to forthwith countersign and register the contract. The substance of this finding of fact was that in

the exercise of discretion the Manager of Improvements and Parks acted in good faith without any taint of fraud and recommended the letting of the contract to the lowest responsible bidder. The Auditor now seeks review of that judgment on the following grounds:

"Concise Summary of Argument

"1. The award rests solely on the Manager's recommendation to the Mayor, and not on later attempts of the Manager at self-justification, either by testimony in this case or otherwise.

"2. The Auditor's refusal to approve the contract must be judged as of the time he acted and the information then before him.

"3. The Manager has certain discretion but that discretion must not be arbitrary, capricious nor from motives of favoritism, and not abused.

"4. The award of the contract in this case to Morse rested altogether on the latter's personal acceptability to Juvenile Judge Gilliam, the other bidders being equally competent and reputable.

"5. The Manager disregarded all tests and standards as to who was or might have been the lowest reliable and responsible bidder within the purview of Section 28 of the Charter, in favor of the one who was most amendable [amenable] to Judge Gilliam's 'ideas' 'and by his work with Gilliam during the past year.'

"6. Morse was briefed and trained for the work long in advance of the authorization of the project. The nine other bidders were out before they ever entered the contest. There was no competitive bidding.

"7. The Manager applied the dollar test, and none other, to all of the five 6% bidders who were 5/100ths of 1% higher than Morse and arbitrarily disregarded all of their bids. He applied no tests at all to the four bidders who were lower than Morse dollarwise. The only test he applied to Morse was his acceptability to Judge Gilliam."

It appears that Judge Gilliam, judge of the juvenile

court, had long advocated the need of the improvements here involved; that he had some far-reaching ideas concerning the same; that Morse, the architect, had concerned himself about the matter sufficiently to have many conferences with Judge Gilliam and between the two of them, had arrived at some conclusions and plans that would necessitate the expenditure of approximately $600,000; it also appears that Judge Gilliam talked with the Manager of Improvements and Parks a number of times concerning his plans and desires; and it was well known that Morse was thoroughly familiar with all the ideas that Judge Gilliam wanted carried into effect; however, when their suggestions were presented, Mayor Newton let them know that he would not be in favor of submitting anything beyond a $350,000 bond issue to the voters and their plans were curtailed accordingly. As before herein noted, the matter was submitted to the voters and approved, and because the Manager of Improvements and Parks and the Mayor, in considering the "lowest responsible bidder" finally favored Morse, although his bid was not the lowest from the dollar standpoint, the Auditor, plaintiff in error, now contends that the contract was not let to the lowest responsible bidder, because the Manager and the Mayor made no inquiry, nor gave any consideration to the four low bids, and insists that the selection of Morse was predetermined; that partiality and favoritism prevailed; further, that Judge Gilliam's ideas were the controlling factor; that the actions of the Manager and Mayor were not the exercise of discretion, but the exercise of caprice and partiality; he further contends that if such actions are upheld by an affirmance of the judgment, the authorities charged with the granting of such contracts may give the contract to whomever they please regardless of price and for any reason that they may adopt; further, that impartiality is not required, but favoritism is permitted; and in fact, there may be no actual competition; and finally, no standard or tests for selection need be observed; that an

award may be on the basis of personal acceptability to some involved official; and opens the door for prearrangement and a selection in advance of any proposed project.

As to the question of whether or not the contract was let to the lowest reliable and responsible bidder: Plaintiff in error, as herein indicated, contends that it was not so let, for several reasons. The City, of course, contends otherwise, and its contention is fully supported by the findings of fact and conclusions of law made by the trial court in the entry of its judgment supporting the City on this question. The presumption that the acts of the Manager were lawful must first be considered and the burden of overcoming this presumption was upon defendant, now plaintiff in error.

■ ■ Courts should not interfere with the determination of the authorities involved in such matters when the determination as to who was the lowest reliable and responsible bidder is made in good faith and to the interest of the public, without collusion or fraud and free of personal favoritism as the basis of reasonable discretion. The exercise of discretion is provided for and expected. In the exercise of this discretion, a determination of responsibility is first to be made, and if this were not so, then the charter would undoubtedly have been so worded that contracts be let to the lowest bidder regardless. We think of no better expression of the discretionary duties and powers of authorities involved in these matters than is expressed in *Pallas v. Johnson, Governor,* 100 Colo., page 449, at page 452, 68 P. (2d) 559. The record discloses no showing whatever that Judge Gilliam ever requested the Manager or the Mayor to award the contract to Morse, or that he ever expressed an opinion to either that Morse was the best qualified architect to have the contract, or that he was the lowest reliable and responsible bidder; and further, we find no evidence of fraud or bad faith or any intimation thereof. It is to be remembered that under the statutory provi-

sions, as well as the ordinance of the City and County of Denver, Judge Gilliam is charged with the "control, maintenance, management and operation of the detention home known as Juvenile Hall." It follows that if he is alert to his obligations, he would be deeply concerned and better advised as to general ideas on planning, and any idea expressed by him through an architect, made in good faith, should receive consideration and respect. Counsel for plaintiff in error would have us believe, as they urged in the trial court, that the only test applied to the letting of the contract to Morse was his acceptability to Judge Gilliam. The trial court, in carefully prepared findings, after hearing all of the evidence, said that the Manager recommended the awarding of the contract to Morse because he was of the honest opinion that Morse was the best qualified, therefore the lowest reliable and responsible bidder, and for no other reason; that this opinion was based upon the long collaboration between Morse and Gilliam in the formation of plans, and because of the work Morse had done, and the investigations he had made, and because none of the other bidders had anything but casual experience with detention facilities; and made a specific finding that there is no evidence of actual fraud or actual bad faith. This finding of the court causes us to adhere firmly to the decision in the case of *City of Denver v. Dumars*, 33 Colo. 94, 80 Pac. 114, which is to the effect that the exercise of the discretion confided to the authorities by the charter will not be interfered with in the absence of proof of fraud or bad faith. Defendant brought forth no evidence to show that any of the bidders lower than Morse knew anything at all about detention facilities or the problems involved in designing alterations and improvements that were contemplated.

Counsel for plaintiff in error state that standards and tests for the awarding of public contracts exist throughout the nation, and that partiality and favoritism or acceptability to some particular official is not one of the

standards or tests, and further state that this Court has not heretofore been called upon to set up any precise code or principles or standards for awarding contracts. All of this is high-sounding, but empty in effect. If we considered ourselves able and competent to undertake the formulation of such a code of standards, we would be encroaching upon the legislative function. It certainly is clear that under the Denver charter and the adjudicated cases, so far as we can ascertain, the responsibility of making the determination is confided to the discretion of such officials as are chosen to act in that capacity, and in the absence of fraud or bad faith, or other acts or circumstances which would vitiate the contract, courts are, and should be, without any authority. In sum, and as a result of the numerous court decisions, the Manager of Improvements and Parks, under the city charter, is advised that he has broad discretion which he must exercise; further, that the lowest bid in dollars and cents does not always control, and the responsibility and reliability of the bidders is to be considered, their financial responsibility, skill, experience and their ability to promptly and satisfactorily complete the contract; and if one bidder, for any reason at all, is, or has become, especially competent to perform the contract anticipated, the way is free for his selection; and when discretion has been exercised in good faith without any taint of fraud, this or any other court will not interfere. Therefore, on this phase of the case before us, the trial court was correct and its judgment should be, and is, affirmed.

The remaining question, is section 28 of the charter, which has hereinbefore been set out, applicable to architects and others in the skilled professions, may be said to be moot so far as disposition of this case is concerned. It is true that counsel for the City, by the first cause of action, which was dismissed, contended that the provision of the charter section did not apply in this case; however, it obtained its objective by a favorable judgment on the second cause of action, which we now

affirm; but it is contended that under Rule 111(f) R.C.P. Colo., it has a right to ask review of the court's ruling in granting the motion to dismiss the first cause of action, and if their contentions are sustained, then the City authorities charged with the making of contracts for professional services are free from the restriction upheld by two decisions of our Court, which counsel for the City contend it is not necessary to overrule, because those cases, *Johnson-Olmsted Realty Co. v. City and County of Denver,* 89 Colo. 250, 1 P. (2d) 928, and *Denver v. Moorman,* 95 Colo. 111, 33 P. (2d) 749, are distinguishable, and the additional contention that here the doctrine of stare decisis is not applicable, because the question involved in the instant case affects procedure only and there are no vested rights, duties or existing liabilities involved. Since the question is before us and since it appears that Colorado, under some wording of the two cases just mentioned, stands alone, while other jurisdictions, by cases that are impressive, hold that a municipality, such as is here involved, can contract for the services of an architect without complying with the charter as here involved, which it seems was intended to control the letting of contracts for the construction of local improvements, we accept and adopt the majority rule. In harmony with this viewpoint, we have the early case of *Denver v. Dumars, supra,* in which our Court in construing a part of what is now section 28 of the Denver charter, said: "In providing for the letting of contracts for the construction of local improvements, the charter provides: 'All such contracts shall be let to the lowest reliable and responsible bidder, after public advertisement by the board for not less than ten days, in some newspaper of general circulation published in the city of Denver. Any other mode of letting such contracts shall be illegal and void.' "

This is an early indication that the provision of the section involved applied to contracts for local improvements and therefore did not apply to a contract in-

volving professional or skilled services. Proper resolution of this question entails the consideration of section 29 of the charter as well as section 28, supra. These two sections comprise a subdivision of the charter under the heading of "Contracts." Section 29 is as follows: "Every contract shall contain a clause to the effect that it is subject to the provisions of this charter and of the ordinance authorizing the improvement; and shall require that eight hours shall constitute a day's labor for any work done under such contract; that the aggregate payments thereon shall not exceed the aggregate estimate of the engineer or the amount appropriated; that upon ten day's notice the work under such contract may, without costs or claim against the city, be suspended by the mayor and board for substantial cause; and that upon complaint of the owner of any real estate to be assessed for the improvements, that the improvement is not being constructed in accordance with the contract, the board shall consider the complaint and thereupon make such order in the premises as may be just, and the decision of the board shall be final."

The latter section is, in many respects, revealing as to what contracts are referred to in section 28. At the outset the first wording of the section is, "Every contract shall contain a clause * * *." This unmistakably is a reference to the contracts mentioned in section 28. A further reading of section 29 discloses that the mandatory requirements of this section could apply only to the matters involved in contracts of public improvements, because such mandatory requirements in a contract for architectural services would seem to be absurd. Thus it seems, in construing the two sections of the charter, it is obvious that it was the intention in framing the charter that this subdivision containing these two sections was applicable only to contracts for the construction of improvements.

*Johnson-Olmsted Realty Co. v. City and County of Denver, supra,* is a case where the city had contracted

with a corporation to render architectural services and to *construct a building,* and there is nothing actually decided in that case contrary to the position of the City now taken as to the applicability of the section of the charter on architectural services. The architectural services there included supervision of all construction on the building. The case of *Denver v. Moorman, supra,* was limited to a reversal of a judgment for architectural services rendered on quantum meruit; however, in the opinion it is stated that our Court had held in the Johnson-Olmsted Realty Company case that section 28 of the Denver charter "applied to services rendered the city by architects." In the Johnson-Olmsted case there is no holding that bids must be received for architectural services alone. Thus we see that the cases are distinguishable, and it is not here necessary to specifically overrule these cases; however, as to those who are unable to make the distinction, we now say that anything said in those cases that may be construed to be a holding that the charter provision is applicable to a contract for architectural services, is overruled, and we accept with complete approval the decisions of other jurisdictions, including California, Indiana, Massachusetts, Minnesota, New York, North Dakota, Ohio, Pennsylvania and Texas, holding that a municipality can contract for the services of an architect without complying with such a requirement as is contained in the charter section in the present case.

We are satisfied to accept and adopt the following language found in the case of *Gulf Bitulithic Co. v. Nueces County* (Tex. Civ. App.), 297 S.W. 747, at 754: "The value of such services is not to be measured by a mere matching of dollars, so to speak; it is not to be determined upon the irrational assumption that all men in the particular class are equally endowed with technical or professional skill, knowledge, training, and efficiency, nor are such services rendered more desirable because offered more cheaply in a competitive bidding

contest. The selection of a person to perform services requiring those attributes calls for the exercise of a wise and unhampered discretion in one seeking such services, for it involves not only personal and professional trustworthiness and responsibility as well."

Also, from the case of *Hunter v. Whiteaker & Washington* (Tex. Civ. App.), 230 S.W. 1096:

"To hold that the act would require that the services of a man belonging to a profession such as that of the law, of medicine, of teaching, civil engineering, or architecture should be obtained by a county only through competitive bidding would give a ridiculous meaning to the act, and require an absurdity.

\* \* \*

"Such a construction would require the selection of attorneys, physicians, school teachers, and civil engineers by competitive bids, the only test being the lowest bid for the services of such men. Such a test would probably be the best that could be conceived for obtaining the services of the least competent man, and would be most disastrous to the material interests of a county."

In fairness, we cannot say that the trial court committed error in sustaining the motion to dismiss the first cause of action in the complaint, for the reason that the court was justified in relying upon, and following, the two decisions of our Court, which, by this opinion, have been distinguished, and in a sense, overruled, in respect to the question of the applicability of the charter provision to contracts for architectural services. The present determination of that question, however, does not affect the rights or interests of either party in this particular case, and therefore the judgment is affirmed.

MR. JUSTICE KNAUSS dissents.