2015 CO 50

TAXPAYERS FOR PUBLIC EDU-
CATION; Cindra S. Barnard; Mason S.
Barnard; James LaRue; Suzanne T. La-
Rue; Interfaith Alliance of Colorado;
Rabbi Joel R. Schwartzman; Rev. Mal-
colm Himschoot; Kevin Leung; Chris-
tian Moreau; Maritza Carrera; and Su-
san McMahon, Petitioners,

v.

DOUGLAS COUNTY SCHOOL DIS-
TRICT, Douglas County Board of Edu-
cation, Colorado State Board of Edu-
cation, and Colorado Department of
Education, Respondents,

and

Florence and Derrick Doyle, on their own
behalf and as next friends of their chil-
dren, A.D. and D.D.; Diana Oakley and
Mark Oakley, on their own behalf and
as next friends of their child, N.O.; and
Jeanette Strohm–Anderson and Mark
Anderson, on their own behalf and as
next friends of their child, M.A., Interve-
nors–Respondents.

Supreme Court Case No. 13SC233

Supreme Court of Colorado.

June 29, 2015

Attorneys for Petitioners Taxpayers for Public Education, Cindra S. Barnard, and Mason S. Barnard: Faegre Baker Daniels LLP, Michael S. McCarthy, Bruce Jones, Colin C. Deihl, Caroline G. Lee, Denver, Colorado.

Attorneys for Petitioners James LaRue, Suzanne T. LaRue, Interfaith Alliance of Colorado, Rabbi Joel R. Schwartzman, Rev. Malcolm Himschoot, Kevin Leung, Christian Moreau, Maritza Carrera, and Susan McMahon: Arnold & Porter LLP, Matthew J. Douglas, Timothy R. MacDonald, Michelle K. Albert, Denver, Colorado, American Civil Liberties Union Foundation of Colorado, Mark Silverstein, Sara Rich, Denver, Colorado, ACLU Foundation Program on Freedom of Religion and Belief, Daniel Mach, Heather L. Weaver, Washington, DC, Americans United for Separation of Church and State, Ayesha N. Khan, Alex J. Luchenitser, Washington, DC.

Attorneys for Respondents Douglas County School District and Douglas County Board of Education: Lewis Roca Rothgerber LLP, James M. Lyons, Eric V. Hall, Denver, Colorado.

Attorneys for Respondents Colorado State Board of Education and Colorado Department of Education: Cynthia H. Coffman, Attorney General, Michael Francisco, Assistant Solicitor General, Antony B. Dyl, Senior Assistant Attorney General, Denver, Colorado.

Attorneys for Intervenors–Respondents: Wilkinson Barker Knauer, LLP, Raymond L. Gifford, Denver, Colorado, Institute for Justice, Michael E. Bindas, Bellevue, Washington, Institute for Justice, William H. Mellor, Richard D. Komer, Arlington, Virginia, Institute for Justice, Timothy D. Keller, Tempe, Arizona.

Attorneys for Amici Curiae American Federation of Teachers and The Education Law Center: Law Office of Elizabeth L. Harris, LLC, Elizabeth L. Harris, Denver, Colorado, Kathleen J. Gebhardt, LLC, Kathleen J. Gebhardt, Boulder, Colorado.

Attorneys for Amici Curiae Anti–Defamation League; Baptist Joint Committee for Religious Liberty; Central Conference of American Rabbis; Disciples Justice Action Network; Equal Partners in Faith; Hadassah, The Women's Zionist Organization of America, Inc.; Hindu American Foundation; Jewish Social Policy Action Network; Union for Reform Judaism; and Women of Reform Judaism: Wheeler Trigg O'Donnell LLP, Craig R. May, Allison McLaughlin, Denver, Colorado, Mayer Brown LLP, Andrew L.

Frey, Richard B. Katskee, Matthew A. Waring, Washington, DC.

Attorneys for Amici Curiae Association of Christian Schools International, Catholic Diocese of Colorado Springs, Colorado Christian University, and Council for Christian Colleges & Universities: Bryan Cave LLP, Stuart J. Lark, Colorado Springs, Colorado, Alliance Defending Freedom, Gregory S. Baylor, Washington, DC.

Attorneys for Amicus Curiae Colorado Education Association: Colorado Education Association, Bradley Bartels, Denver, Colorado.

Attorneys for Amicus Curiae The Becket Fund for Religious Liberty: Sparks Willson Borges Brandt & Johnson P.C., Scott W. Johnson, Colorado Springs, Colorado, The Becket Fund for Religious Liberty, Diana M. Verm, Luke W. Goodrich, Washington, DC.

Attorneys for Amicus Curiae Colorado Association of School Boards: Colorado Association of School Boards, Kathleen A. Sullivan, Elizabeth Friel, Denver, Colorado.

Attorneys for Amici Curiae The Independence Institute and The Friedman Foundation for Educational Choice: Independence Institute, David B. Kopel, Denver, Colorado.

Attorneys for Amicus Curiae National Education Association: Recht Kornfeld PC, Mark Grueskin, Denver, Colorado, National Education Association, Alice O'Brien, Philip A. Hostak, Kristen Hollar, Washington, D.C.

Attorneys for Amicus Curiae Pacific Legal Foundation: Sherman & Howard, LLC, Ryan J. Klein, Colorado Springs, Colorado, Pacific Legal Foundation, Joshua P. Thompson, Sacramento, California.

CHIEF JUSTICE RICE announced the judgment of the Court.

¶1 Four years ago, the Douglas County School District ("the District") implemented its Choice Scholarship Pilot Program ("the CSP"), a grant mechanism that awarded taxpayer-funded scholarships to qualifying elementary, middle, and high school students. Those students could use their scholarships to help pay their tuition at partnering private schools, including religious schools. Following a lawsuit from Douglas County taxpayers, the trial court found that the CSP violated the Public School Finance Act of 1994, §§ 22–54–101 to –135, C.R.S. (2014) ("the Act"), as well as various provisions of the Colorado Constitution. The trial court thus permanently enjoined implementation of the CSP. The court of appeals reversed, holding that (1) Petitioners lacked standing to sue under the Act, and (2) the CSP did not violate the Colorado Constitution. *Taxpayers for Pub. Educ. v. Douglas Cnty. Sch. Dist.*, 2013 COA 20, ¶4, —— P.3d ——. We granted certiorari to determine whether the CSP comports with both the Act and the Colorado Constitution.[1]

---

1. Specifically, we granted certiorari on the following issues:

   1. [REFRAMED] Whether the court of appeals erred by restricting Colorado's standing doctrine when it held that the Public School Finance Act of 1994's ("the Act") mere grant of authority to the State Board to issue rules and regulations necessarily deprives [Petitioners] of standing and precludes any private action to enjoin [the District] from violating the Act.
   2. [REFRAMED] Whether the [CSP] violates the Act by including 500 Program students "enrolled" in an illusory Charter School who actually attend private schools in the District and elsewhere in the District's student count for funding.
   3. [REFRAMED] Whether the court of appeals erred in ruling that the [CSP] is entitled to a presumption of constitutionality under article IX, section 3, that can only be rebutted by proof of unconstitutionality "beyond a reasonable doubt," and therefore concluding that fund monies were not spent on the [CSP], notwithstanding the trial court's factual finding to the contrary.
   4. Whether the [CSP] violates article IX, section 7, of the Colorado Constitution by diverting state educational funds intended for Douglas County public school students to private · elementary and secondary schools controlled by churches and religious organizations.
   5. Whether the [CSP] violates the compelled-support and compelled-attendance clauses of article II, section 4, of the Colorado Constitution by directing taxpayer funds to churches and religious organizations, and by compelling students enrolled in a public charter school to attend religious services.
   6. Whether the [CSP] violates article IX, section 8, of the Colorado Constitution by requiring students who are enrolled in a public charter school, and counted by Douglas

¶ 2 We first hold that Petitioners lack standing to challenge the CSP under the Act. We further hold, however, that the CSP violates article IX, section 7 of the Colorado Constitution.[2] Accordingly, we reverse the judgment of the court of appeals and remand the case to that court with instructions to return the case to the trial court so that the trial court may reinstate its order permanently enjoining the CSP.

## I. Facts and Procedural History

### A. Background and Logistics of the CSP

¶ 3 The facts of this case, as found by the trial court following a three-day injunction hearing, are largely undisputed. In March of 2011, the Douglas County School Board approved the CSP for the 2011–12 school year. The CSP operates on parallel tracks: In order to receive scholarship funds, students must not only apply for a scholarship through the District, but they must also gain admittance to a participating private school, labeled a "Private School Partner." In order to qualify as a Private School Partner, the private school must satisfy certain requirements and must allow Douglas County to administer various assessment tests. The private school need not, however, modify its admission criteria, and the CSP explicitly authorizes Private School Partners to make "enrollment decisions based upon religious beliefs."

¶ 4 The CSP funds itself through education revenue that it receives from the State. To accomplish this, the CSP requires scholarship recipients to enroll in the District's Choice Scholarship Charter School ("the Charter School"), even though they in fact attend private schools. The Charter School is not actually a school in any meaningful

sense; the trial court found that it "has no buildings, employs no teachers, requires no supplies or books, and has no curriculum." But because the Charter School is nominally a public school, the District includes all students "enrolled" at the school as pupils in its report to the State, which then provides education funding to the District on a per-pupil basis.[3] For the 2011–12 school year (the year at issue when the trial court conducted the injunction hearing), this per-pupil revenue was estimated at $6,100.

¶ 5 For each scholarship recipient enrolled at the Charter School, the District retains 25% of the per-pupil revenue to cover the CSP's administrative costs. The District then sends the remaining 75% of the per-pupil revenue ($4,575 for the 2011–12 school year) to the student's chosen Private School Partner in the form of a restrictively endorsed check made out to the student's parent.[4] The parent must then endorse the check "for the sole purpose of paying for tuition at the Private School Partner."

¶ 6 In theory, then, the CSP operates as a simple tuition offset. The District awards money to the parent of a qualifying student, and the parent then uses this money to pay a portion of the student's tuition. The trial court found, however, that the CSP "does not prohibit participating private schools from raising tuition after being approved to participate in the [CSP], or from reducing financial aid for students who participate in the [CSP]." And in fact, the trial court cited one instance where a Private School Partner slashed a recipient's financial aid in the amount of the scholarship.[5]

¶ 7 In the CSP's pilot phase, up to 500 Douglas County students were eligible to receive scholarships. At the time of the

---

County as public school students, to be taught religious tenets, submit to religious admission tests, and attend religious services.

2. Because we conclude that the CSP violates section 7, we need not consider whether it complies with the other constitutional provisions at issue.

3. *See, e.g.,* §§ 22–54–103 to –104, C.R.S. (2014).

4. If the Private School Partner's tuition is less than 75% of the per-pupil revenue, the District sends a check for the lesser amount.

5. The District's Assistant Superintendent of Elementary Education testified that he was unaware of this incident. He further asserted that if a Private School Partner reduced a recipient's scholarship amount in such a manner, such an action would "go against the intended contract" of the CSP.

injunction hearing, 271 scholarship recipients had been accepted to one of twenty-three different Private School Partners. The trial court found sixteen of those twenty-three schools to be religious in character. At the time of the hearing, roughly 93% of scholarship recipients had enrolled in religious schools; of the 120 high school students, all but one chose to attend a religious school.[6]

## B. The Litigation

¶ 8 In June of 2011, three months after the Douglas County School Board approved the CSP, Petitioners [7] filed suit against the Colorado Board of Education ("the State Board"), the Colorado Department of Education, the Douglas County Board of Education, and the District (collectively, "Respondents"). Petitioners sought a declaratory judgment that the CSP violated both the Act and the Colorado Constitution, as well as a permanent injunction prohibiting Respondents from "taking any actions to fund, implement or enforce" the CSP. Following a three-day hearing, the trial court issued a sixty-eight-page order granting Petitioners' desired relief. The trial court first found that Petitioners had standing to sue under the Act and that the CSP violated the Act. It further found that the CSP violated the following provisions of the Colorado Constitution: article II, section 4; article V, section 34;[8] article IX, section 3; article IX, section 7; and article IX, section 8.

¶ 9 Respondents appealed, and in a split decision, the court of appeals reversed. *Taxpayers for Pub. Educ.*, ¶ 4. The court of appeals first determined that Petitioners lacked standing to sue under the Act. *Id.* at ¶ 22. It then held that the CSP violated none of the pertinent provisions of the Colorado Constitution. *Id.* at ¶¶ 48, 55, 58, 76, 89, 94, 103. The court of appeals thus directed the trial court to enter judgment in favor of Respondents. *Id.* at ¶ 107.

¶ 10 Judge Bernard dissented. In a lengthy opinion, he asserted that article IX, section 7 of the Colorado Constitution "prohibits public school districts from channeling public money to private religious schools." *Id.* at ¶ 110 (Bernard, J., dissenting). Judge Bernard then analogized the CSP to "a pipeline that violates this direct and clear constitutional command." *Id.* at ¶ 111. Therefore, he concluded that section 7 renders the CSP unconstitutional. *Id.*

¶ 11 We granted certiorari review on six distinct issues. *See supra* ¶ 1 n. 1. In essence, however, this dispute revolves around two central questions. First, do Petitioners have standing under the Act to challenge the validity of the CSP (and, if so, does the CSP in fact violate the Act)? Second, does the CSP violate the Colorado Constitution? As a matter of jurisprudential policy, we first address the statutory issue rather than the constitutional issue. *See Developmental Pathways v. Ritter*, 178 P.3d 524, 535 (Colo. 2008) ("[T]he principle ·of judicial restraint requires us to 'avoid reaching constitutional questions in advance of the necessity of deciding them.' " (quoting *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988))). Accordingly, we now consider whether Petitioners have standing under the Act.

## II. Standing Under the Act

¶ 12 Petitioners argue that the CSP fails to comport with the Act because it uses public funds to finance private education. *See* § 22–54–104(1)(a), C.R.S. (2014) (devising a formula to calculate the amount of money awarded to a school district "to fund the costs of providing *public* education" (emphasis added)). In order to mount this challenge, Petitioners must first establish that they have standing to sue under the Act. *See Ainscough v. Owens*, 90 P.3d 851, 855 (Colo.2004) ("Standing is a threshold issue

---

**6.** The trial court found that "virtually all high school students" who received scholarships could only attend religious schools, as the only two non-religious Private School Partners serving high school students were restricted to either gifted or special-needs students.

**7.** Petitioners include Taxpayers for Public Education, a nonprofit organization focused on public education; several Douglas County taxpayers and their children; and various other interested parties.

**8.** Petitioners did not seek review of whether the CSP violates article V, section 34.

that must be satisfied in order to decide a case on the merits."). After scrutinizing the Act and reviewing our case law, we conclude that Petitioners lack such standing.

### A. Standard of Review

¶ 13 Standing is a question of law that we review de novo. *Id.* at 856.

### B. The Test for Standing

¶ 14 In order to establish standing to sue, a plaintiff must satisfy two elements. First, he must show that he suffered an *injury in fact;* second, he must demonstrate that his injury pertains to a *legally protected interest. Wimberly v. Ettenberg,* 194 Colo. 163, 570 P.2d 535, 539 (1977). Assuming, without deciding, that Petitioners here have alleged an injury in fact, we consider whether that injury implicates a legally protected interest.

¶ 15 In the statutory context, whether the plaintiff's alleged injury involves a legally protected interest turns on "whether the plaintiff has a claim for relief under" the statute at issue. *Ainscough,* 90 P.3d at 856. Generally, if the legislature "enact[s] a particular administrative remedy to redress a statutory violation," that decision "is consistent with a legislative intent to preclude a private civil remedy for breach of the statutory duty." *Allstate Ins. Co. v. Parfrey,* 830 P.2d 905, 910 (Colo.1992). But if the statute "is totally silent on the matter of remedy," then the court "must determine whether a private civil remedy reasonably may be implied." *Id.* To answer this question, the court must examine three factors: (1) "whether the plaintiff is within the class of persons intended to be benefitted by the legislative enactment"; (2) "whether the legislature intended to create, albeit implicitly, a

private right of action"; and (3) "whether an implied civil remedy would be consistent with the purposes of the legislative scheme." *Id.* at 911.[9]

¶ 16 With these principles in mind, we now address whether the Act confers a legally protected interest upon Petitioners.

### C. The Act Does Not Confer a Legally Protected Interest upon Petitioners

¶ 17 In order for the Act to confer a legally protected interest, it must authorize a claim for relief, either expressly or impliedly. Petitioners concede that the Act does not explicitly permit a private right of action. The question, then, is whether we can infer such a right from the legislature's intent. We conclude that we cannot.

¶ 18 At the outset, we reject Respondents' contention that the Act houses an "extensive remedial system" that automatically forecloses a private right of action. It is true that, where a statute features particular remedies, we will not imply additional remedies. *See, e.g., Capital Sec. of Am., Inc. v. Griffin,* 2012 CO 39, ¶¶ 2–3, 278 P.3d 342, 343 (holding that the legislature did not intend to imply a disgorgement remedy for violation of a securities statute because the "statutory scheme adopted by the General Assembly expressly sets forth a number of [other] remedies"); *Gerrity Oil & Gas Corp. v. Magness,* 946 P.2d 913, 925 (Colo.1997) (holding that, because an oil and gas statute only authorized suits for injunctive relief, the legislature affirmatively "chose not to include a private remedy in damages" and that "we will not infer such a remedy"); *Bd. of Cnty. Comm'rs v. Moreland,* 764 P.2d 812, 818 (Colo.1988) (holding that the plaintiff could not sue for violation of a building code in part because different remedies were "specifically provided by the statute authorizing enact-

---

**9.** We recognize that *Parfrey*'s three-factor test applies nominally to suits against private parties, *see* 830 P.2d at 911, and that we have never formally announced a test to determine whether a statute impliedly authorizes a claim for relief against a public entity. Our court of appeals, however, has repeatedly used a virtually identical test in the governmental context. *See, e.g., Macurdy v. Faure,* 176 P.3d 880, 882 (Colo.App. 2007) (examining the *Parfrey* factors in holding that the plaintiff could not sue a county coroner

for failing to perform a statutorily required autopsy); *Olson v. City of Golden,* 53 P.3d 747, 752 (Colo.App.2002) (examining three criteria indistinguishable from the *Parfrey* factors in holding that the plaintiff could not sue the city for violating an urban renewal law). Because the *Parfrey* factors revolve around the touchstone of legislative intent–and because they make no qualitative distinction regarding the character of the defendant in a particular suit–they are applicable to the facts of this case.

ment of" the code). But here, the Act features no such explicit remedies. The only language in the Act tangentially relating to the subject of remedy appears in section 22–54–120(1), C.R.S. (2014), which provides that the State Board "shall make reasonable rules and regulations necessary for the administration and enforcement" of the Act. This is generalized language that in no way articulates a particularized enforcement scheme. As such, the Act is materially different from, for example, a statute that authorizes a public entity that purchased unlawful securities to "force the seller to repurchase the securities," *Griffin*, ¶ 22, 278 P.3d at 346, or a statute that "clearly permits a private party to seek injunctive relief" for violation of an oil and gas statute, *Gerrity Oil*, 946 P.2d at 925.[10]

¶ 19 Because the Act features no explicit remedies, we must turn to the three *Parfrey* factors. *Supra* ¶ 15. First, it is clear that Petitioners are "within the class of persons intended to be benefitted" by the Act. *See Parfrey*, 830 P.2d at 911. The Act formally declares that it is designed "to provide for a thorough and uniform system of public schools throughout the state" in accordance with article IX, section 2 of the Colorado Constitution. § 22–54–102(1), C.R.S. (2014). That constitutional provision guarantees that "all [school-age] residents of the state … may be educated gratuitously." Colo. Const. art. IX, § 2. Petitioners are school-age Douglas County children (and their parents), and the Act operates to ensure that they may receive a free public education. Thus, they are the Act's intended beneficiaries.

¶ 20 But the second factor—"whether the legislature intended to create, albeit implicitly, a private right of action," *Parfrey*, 830 P.2d at 911—is where Petitioners' claim

falters. As we have made clear, "we will not infer a private right of action based on a statutory violation unless we discern a *clear legislative intent* to create such a cause of action." *Gerrity Oil*, 946 P.2d at 923 (emphasis added). Here, nothing in the Act suggests that the General Assembly intended to allow private parties to redress violations of the statute in court. To the contrary, the Act instructs the State Board to "make reasonable rules and regulations" to enforce its provisions. § 22–54–120(1). Although this language does not affirmatively create an administrative remedy, *see supra* ¶18, it nevertheless indicates that the General Assembly contemplated providing a private remedy but ultimately refused to do so, choosing instead to entrust enforcement to the State Board. *Cf. Gerrity Oil*, 946 P.2d at 925 n. 6 ("Inferring a private cause of action … every time a person violates the [Oil and Gas Conservation] Act or rules issued thereunder would also be inconsistent with the *clear legislative intent* that the [Oil and Gas Conservation] [C]ommission have *primary responsibility* for enforcing the Act's provisions." (emphasis added)). Therefore, the Act manifests the General Assembly's intent that the State Board—not private citizens—be responsible for ensuring its lawful implementation.[11]

¶ 21 Similarly, the third factor—"whether an implied civil remedy would be consistent with the purposes of the legislative scheme," *Parfrey*, 830 P.2d at 911—also militates against inferring a private right of action. Again, the overarching purpose of the Act is to fulfill Colorado's constitutional mandate to provide free public education to school-age children. *See* Colo. Const. art. IX, § 2; § 22–54–102(1). This is a duty of obvious importance, and its execution necessarily re-

---

10. Respondents point out that, pursuant to section 22–54–120(1), the State Board enacted a number of regulations, *see* 1 CCR 301–39:2254–R–1.00 to –20.00, and they argue that these regulations house exclusive administrative remedies. But regulations are not statutes—they are not crafted by the General Assembly. Thus, that the State Board possessed legislative authority to enact regulations does not transform those regulations into a Rosetta stone that allows us to decipher the General Assembly's intent.

11. Petitioners assert that the State Board in fact colluded with Douglas County in implementing the CSP. Thus, in Petitioners' view, the State Board abdicated its statutorily delegated responsibility to enforce the Act, meaning it now falls to them to force the Board to properly execute its duties. Putting aside the veracity of Petitioners' collusion claim (which Respondents naturally dispute), Petitioners cite no authority suggesting that the State Board's hypothetical failure would automatically confer standing on private parties.

quires both the State Board and the Colorado Department of Education ("the Department") to craft complicated procedures and devise detailed funding formulae. *See, e.g.,* § 22–54–106.5(2), C.R.S. (2014) (directing the Department to calculate an amount to be kept in "fiscal emergency restricted reserve"); § 22–54–114(2), C.R.S. (2014) (requiring the Department to determine funding requirements for each school district); § 22–54–117(1)(a), C.R.S. (2014) (authorizing the State Board to approve payments from the "contingency reserve"); § 22–54–129(6)(a), C.R.S. (2014) (instructing the State Board to "promulgate rules" to effectuate the funding of facility schools). Because both agencies must engage in myriad tasks, they require a degree of flexibility for the Act to function properly. Allowing citizen suits would severely impede this complex process, thereby thwarting the purpose of the legislative scheme. It is inevitable that some members of the public will disapprove of any given government action. But that disapproval does not justify allowing private parties to sue the State Board and the Department for every perceived violation of the Act. Were that the case, these agencies would be paralyzed with litigation from dissatisfied constituents, crippling their effectiveness.

¶ 22 Finally, we reject Petitioners' argument that they have taxpayer standing. Generally speaking, taxpayer standing "flows from an 'economic interest in having [the taxpayer's] tax dollars spent in a constitutional manner.'" *Hickenlooper v. Freedom from Religion Found., Inc.,* 2014 CO 77, ¶ 11 n. 10, 338 P.3d 1002, 1007 n. 10 (alteration in original) (quoting *Conrad v. City & Cnty. of Denver,* 656 P.2d 662, 668 (Colo.1982)). Thus, although we have recognized that Colorado permits "broad taxpayer standing," *Ainscough,* 90 P.3d at 856, the doctrine typically applies when plaintiffs allege *constitutional* violations. *See, e.g., Barber v. Ritter,*

196 P.3d 238, 247 (Colo.2008) (holding that the plaintiffs had "taxpayer standing to challenge *the constitutionality* of [governmental] transfers of money" (emphasis added)); *Conrad,* 656 P.2d at 668 (recognizing taxpayer standing because "the plaintiffs [have] alleged injury flowing from governmental violations of *constitutional* provisions that specifically protect the legal interests involved" (emphasis added)).[12] Expanding taxpayer standing to cases where a plaintiff alleges that the government violated a *statute*—as Petitioners seek to do here—would effectively nullify the enduring requirement that the statute actually authorizes a claim for relief. *See Ainscough,* 90 P.3d at 856. This in turn would render superfluous *Parfrey*'s well-settled three-factor test for divining whether the General Assembly intended to imply a private right of action into a statute. We thus decline to endorse Petitioners' broad and novel conception of taxpayer standing.[13]

¶ 23 In sum, we conclude that the General Assembly did not intend to imply a private right of action into the Act and that such a remedy would be inconsistent with the Act's legislative scheme. Therefore, Petitioners cannot state a claim for relief under the Act, meaning it does not furnish them with a legally protected interest, one of the two prerequisites for standing. *See Wimberly,* 570 P.2d at 539. Accordingly, we hold that Petitioners lack standing to challenge the CSP under the Act.

¶ 24 Because Petitioners lack standing, we need not consider whether the CSP in fact fails to comply with the Act. Instead, we now turn to whether the CSP violates article IX, section 7 of the Colorado Constitution.

### III. Article IX, Section 7 of the Colorado Constitution

¶ 25 To resolve whether or not the CSP violates the Colorado Constitution, we

---

12. For this reason, Respondents do not dispute that Petitioners have standing to assert their claims that the CSP violates the Colorado Constitution.

13. Despite Petitioners' insistence, our analysis here in no way conflicts with our opinion in *Dodge v. Department of Social Services,* 198 Colo. 379, 600 P.2d 70 (1979). In that case, we held that the plaintiffs had "standing to litigate the issue of whether ... [the government has] the

*statutory authority* to use public funds for nontherapeutic abortions." *Id.* at 72 (emphasis added). But the plaintiffs in *Dodge* did not argue that the government had *violated* a particular statute; rather, they claimed that *no* statute authorized the government's behavior. *See id.* at 71. Thus, *Dodge* has no bearing on the issue of whether a plaintiff has a claim for relief under a particular statute.

first consider the CSP as a whole and conclude that it conflicts with the plain language of article IX, section 7. We then examine our prior decision in *Americans United for Separation of Church & State Fund, Inc. v. State*, 648 P.2d 1072, 1074–75 (Colo.1982)—in which we held that a grant program that awarded money to students attending religious universities did *not* run afoul of section 7—and we determine that the CSP is distinguishable from the grant program at issue in that case. Finally, we reject Respondents' argument that striking down the CSP under the Colorado Constitution in fact violates the First Amendment to the United States Constitution. Accordingly, we hold that the CSP violates section 7 and is thus unconstitutional.

### A. Standard of Review

¶ 26 We review the trial court's determination of the CSP's constitutionality de novo. *See Justus v. State*, 2014 CO 75, ¶ 17, 336 P.3d 202, 208. When reviewing a statute, we presume that the statute is constitutional, and we will only void it if we deem it to be unconstitutional beyond a reasonable doubt. *Id.*[14]

### B. The CSP Conflicts with the Plain Language of Section 7

¶ 27 The Colorado Constitution features broad, unequivocal language forbidding the State from using public money to fund religious schools. Specifically, article IX, section 7—entitled "Aid to private schools, churches, sectarian purpose, forbidden"—includes the following proscriptive language:

Neither the general assembly, nor any *county*, city, town, township, *school district* or other public corporation, *shall ever* make any appropriation, or *pay from any public fund or moneys whatever, anything in aid of any church or sectarian society, or for any sectarian purpose,* or to *help support or sustain any school,* academy, seminary, college, university or other literary or scientific institution, *controlled by*

*any church or sectarian denomination whatsoever . . . .*

(Emphasis added.) Although this provision uses the term "sectarian" rather than "religious," the two words are synonymous. *See Black's Law Dictionary* 1557 (10th ed. 2014) (defining "sectarian" as "[o]f, relating to, or involving a particular religious sect; esp., supporting a particular religious group and its beliefs"). That section 7 twice equates the term "sectarian" with the word "church" only reinforces this point. Therefore, this stark constitutional provision makes one thing clear: A school district may not aid religious schools.

¶ 28 Yet aiding religious schools is exactly what the CSP does. The CSP essentially functions as a recruitment program, teaming with various religious schools (i.e., the Private School Partners) and encouraging students to attend those schools via the inducement of scholarships. To be sure, the CSP does not explicitly funnel money directly to religious schools, instead providing financial aid to students. But section 7's prohibitions are not limited to direct funding. Rather, section 7 bars school districts from "pay[ing] from any public fund or moneys *whatever, anything* in aid of any" religious institution, and from "help[ing] *support or sustain* any school ... controlled by any church or sectarian denomination *whatsoever*" (emphasis added). Given that private religious schools rely on students' attendance (and their corresponding tuition payments) for their ongoing survival, the CSP's facilitation of such attendance necessarily constitutes aid to "support or sustain" those schools. Section 7 precludes school districts from providing such aid.

¶ 29 Respondents point out that the CSP does not *require* scholarship recipients to enroll in a religious school, nor does it force participating Private School Partners to be religious. Respondents thus suggest that the CSP features an element of private choice that severs the link between the District's aid to the student and the student's

---

**14.** Petitioners argue that this presumption of constitutionality should not apply here because the CSP is a creation of a local school board rather than a statute passed by the General Assembly. Because we conclude that the CSP is unconstitutional even in light of the presumption, we need not consider this argument.

ultimate attendance at a (potentially) religious school. It is true that the CSP does not *only* partner with religious schools; several Private School Partners are non-religious. The fact remains, however, that the CSP awards public money to students who may then use that money to pay for a religious education. In so doing, the CSP aids religious institutions. Thus, even ignoring the pragmatic realities that scholarship recipients face—such as the trial court's finding that "virtually all high school students" can only use their scholarships to attend religious schools—the CSP violates the clear constitutional command of section 7.[15]

¶ 30 The program's lack of vital safeguards only bolsters our conclusion that it is constitutionally infirm. Most troubling is that the CSP does not forbid a Private School Partner from raising a scholarship recipient's tuition (or reducing his financial aid) in the amount of the scholarship awarded. Such conduct would pervert the program's "offset" approach and would instead result in the District channeling taxpayer money directly to a religious school. As the trial court found, one religious Private School Partner has already engaged in this very behavior.[16]

¶ 31 Respondents nevertheless contend that the plain language of section 7 is not plain at all, but that the term "sectarian" is actually code for "Catholic." In so doing, Respondents charge that section 7 is a so-called "Blaine Amendment" that is bigoted in origin. *See Taxpayers for Pub. Educ.*, ¶ 62 n.13 (describing Blaine Amendments as "state laws and constitutional provisions which allegedly arose out of anti-Catholic

school sentiment"). They thus encourage us to wade into the history of section 7's adoption and declare that the framers created section 7 in a vulgar display of anti-Catholic animus.

¶ 32 We need not perform such an exegesis to dispose of Respondents' argument. Instead, we need merely recall that "constitutional provisions must be declared and enforced as written" whenever their language is "plain" and their meaning is "clear." *People v. Rodriguez*, 112 P.3d 693, 696 (Colo. 2005). As discussed, the term "sectarian" plainly means "religious." Therefore, we will enforce section 7 as it is written.[17]

¶ 33 Accordingly, we cannot square the CSP's resultant aid of religious schools with the plain language of section 7. Respondents insist, however, that both state and federal case law compel the conclusion that the CSP in fact comports with section 7. We now review this case law, beginning with our decision in *Americans United*.

## C. *Americans United* Is Distinguishable

¶ 34 In *Americans United*, we upheld a grant program that awarded public money to college students who attended religious universities, provided those universities were not "pervasively sectarian." 648 P.2d at 1074–75. Respondents assert that the present case is "no different" from *Americans United*, meaning that we must uphold the CSP. Our analysis reveals, however, that the grant program in *Americans United* diverges from the CSP in numerous critical ways.

---

15. Respondents present a parade of horribles, arguing that any decision striking down the CSP will produce ripple effects invalidating other public-private partnerships across the state where public money flows to religious schools. But the constitutionality of those programs is not at issue here, and the record contains no data regarding their operation. Therefore, we choose to focus our analysis solely on the CSP.

16. The court of appeals dismissed this incident, highlighting the superintendent's testimony that such conduct "would be in violation of the CSP" and noting that the trial court "cited no evidence supporting a conclusion that such [a] reduction was permissible under the CSP." *Taxpayers for Pub. Educ.*, ¶ 70. But this analysis inverts the issue. The problem is not that the CSP declares

such a reduction to be permissible (it does not); it is that the program does not make such reductions *impermissible*.

17. We note that Respondents' suggestion that "sectarian" literally means "Catholic" is tantamount to an attack on section 7's constitutionality, as the provision would patently violate the First Amendment if it discriminated against a particular religion. But the constitutionality of section 7 is not before us. And Respondents' attempted evasion of this procedural obstacle— they claim that they are not challenging section 7 itself but rather Petitioners' *interpretation* of it— is little more than a Trojan horse inviting us to rule on the actual legitimacy of section 7. We decline such an invitation.

As such, the outcome of that case is not dispositive of—and indeed has minimal bearing on—the present dispute.

¶ 35 *Americans United* revolved around the Colorado Student Incentive Grant Program ("the grant program"), a scholarship for in-state college students. *Id.* at 1074. The grant program allowed eligible universities to recommend particular students deserving of scholarships to the Colorado Commission of Higher Education, which in turn administered the grants. *Id.* at 1075. The Commission awarded the grant money to the university, which then reduced the student's tuition by the amount of the grant. *See id.* at 1081 ("The educational institution serves essentially as a conduit for crediting the funds to the student's account."). Although the grant program embraced most colleges and universities, it excluded institutions that were "pervasively sectarian," and it defined six eligibility criteria that schools needed to meet in order *not* to be branded pervasively sectarian. *Id.* at 1075. We deemed the grant program to be constitutional, *id.* at 1074, and Respondents thus contend that we must now reach the same result with the CSP.

¶ 36 Respondents' reasoning is flawed. Admittedly, the grant program and the CSP share certain core features; both award public money to students attending religious schools, and both are primarily designed to aid students rather than institutions. But closer scrutiny reveals a crippling defect in Respondents' argument: The rationales animating our holding in *Americans United* are inapplicable to this case. That is, in determining that the grant program complied with section 7, we cited several crucial factors. *Id.* at 1083–84. Those factors are absent here.

¶ 37 First, we noted in *Americans United* that the grant program was "designed to assist the student, not the institution." *Id.* at 1083. Facially, that is true of the CSP as well. Yet in *Americans United,* we tethered this observation to the fact that grant recipients could not attend "pervasively sectarian" institutions, noting that this exclusion *"obviates any real possibility* that the aid itself might somehow flow indirectly to an institution whose educational function is not clearly separable from its religious mission." *Id.* at 1081 (emphasis added). Here, that possibility is very real. The CSP places no limitations on the extent to which religion infuses a Private School Partner,[18] and it in fact affirmatively authorizes partnering schools to make "enrollment decisions based upon religious beliefs." Therefore, it is entirely plausible that the CSP gives aid to schools "whose educational function is not clearly separable from [their] religious mission." *See Americans United,* 648 P.2d at 1081.

¶ 38 Second, the grant program only awarded scholarships to students of higher education. *Id.* at 1084. Recognizing that "as a general rule religious indoctrination is not a substantial purpose of sectarian colleges and universities," we concluded that "there is less risk of religion intruding into the secular educational function of the institution than there is at the level of parochial elementary and secondary education." *Id.* Obviously, this rationale of diminished risk cannot apply to the CSP, which covers not collegiate pupils but elementary and secondary school students.[19]

¶ 39 Third, the grant program aided students who attended both public and private universities. We deemed this to be of critical importance, noting that students' opportunity to attend public schools "dispell[ed] any notion that the aid is calculated to enhance the

18. We do not suggest, of course, that grafting such limitations onto the CSP would necessarily render it compliant with section 7, or would even comport with the First Amendment. *See infra* ¶48 (discussing *Colorado Christian University v. Weaver,* 534 F.3d ·1245, 1250, 1263 (10th Cir. 2008), which held that the "pervasively sectarian" distinction in Colorado's scholarship programs violated the First Amendment). Regardless, Petitioners do not seek to rewrite the CSP so that it excludes religious schools (pervasively sec-

tarian or otherwise); they simply desire a court order enjoining implementation of the CSP in its entirety.

19. Again, we do not imply that the CSP would necessarily be constitutional if it pertained to college students. We simply point out that a linchpin of our analysis in *Americans United* is irrelevant here.

ideological ends of the sectarian institution." *Id.* Once again, this is not true of the CSP, which only bestows scholarships to students attending private schools.

¶ 40 Fourth, the grant program explicitly provided that "no institution shall decrease the amount of its own funds spent for student aid below the amount spent prior to participation in the program." *Id.* We recognized that this formal prohibition "create[d] a disincentive for an institution to use grant funds other than for the purpose intended— the secular educational needs of the student." *Id.* As discussed, *supra* ¶30, the CSP lacks this significant safeguard, and in fact one religious Private School Partner did reduce a student's financial aid in the amount of the student's scholarship.

¶ 41 Finally, in order to be eligible for the grant program, a university's governing board could not "reflect" a particular religion, nor could its membership be "limited to persons of any particular religion." *Americans United,* 648 P.2d at 1075. We noted that this restriction "militate[d] against the type of ideological control over the secular educational function" that section 7 forbids, particularly because it "require[d] a strong commitment to academic freedom by an essentially independent governing board with no sectarian bent in the curriculum tending to indoctrinate or proselytize." *Id.* at 1084. Because the CSP willingly partners with private schools that reflect a particular religion, this rationale from *Americans United* is wholly inapplicable here.

¶ 42 All told, although the grant·program and the CSP feature surface similarities, they are two highly distinct scholarship programs. Therefore, because our analysis in *Americans United* relied heavily on elements of the grant program that are missing from the CSP, that analysis is of minimal relevance in our quest to determine the CSP's constitutionality.

¶ 43 Accordingly, we reject Respondents' argument that *Americans United* requires us to uphold the CSP. Having done so, we now turn to Respondents' assertion that invalidating the CSP in fact violates the First Amendment.

### D. Invalidating the CSP Does Not Violate the First Amendment

¶ 44 The First Amendment to the United States Constitution provides in part that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." Respondents contend that several federal cases interpreting the First Amendment constitute binding case law forbidding us from striking down the CSP. In particular, Respondents cite the U.S. Supreme Court's decision in *Zelman v. Simmons–Harris,* 536 U.S. 639, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002), and the Tenth Circuit's opinion in *Colorado Christian University v. Weaver,* 534 F.3d 1245 (10th Cir. 2008).[20] We conclude that neither of these cases is availing.

¶ 45 In *Zelman,* the Court held that an Ohio scholarship program ("the Ohio program") that allowed students to attend religious schools did not violate the First Amendment's Establishment Clause. 536 U.S. at 644–45, 122 S.Ct. 2460. The Court noted that the Ohio program was "entirely neutral with respect to religion" and that it was "a program of true private choice" because it allowed students and parents "to exercise genuine choice among options public and private, secular and religious." *Id.* at 662, 122 S.Ct. 2460. Respondents assert that the CSP bears "striking similarities" to the Ohio program, meaning that *Zelman* controls the outcome here.

¶ 46 Had Petitioners claimed that the CSP violated the Establishment Clause, *Zelman* might constitute persuasive authority. But they did not. Rather, Petitioners challenged the CSP under article IX, section

---

20. Respondents also rely on *Mitchell v. Helms,* 530 U.S. 793, 829, 120 S.Ct. 2530, 147 L.Ed.2d 660 (2000), in which a plurality of the Court held that a law that indirectly aided religious schools did not violate the Establishment Clause because it "determine[d] eligibility for aid neutrally, allo-cate[d] that aid based on the private choices of the parents of schoolchildren, and [did] not provide aid that ha[d] an impermissible content." Because *Mitchell* was a plurality opinion, it is not binding precedent. We thus decline to ascribe to it the force of law.

7 of the Colorado Constitution. By its terms, section 7 is far more restrictive than the Establishment Clause regarding governmental aid to religion, and the Supreme Court has recognized that state constitutions may draw a tighter net around the conferral of such aid. *See Locke v. Davey,* 540 U.S. 712, 721, 124 S.Ct. 1307, 158 L.Ed.2d 1 (2004) ("[T]he subject of religion is one in which both the United States and state constitutions embody distinct views.... That a State would deal differently with religious education for the ministry than with education for other callings is a product of these views, not evidence of hostility toward religion.").[21] As such, *Zelman's* reasoning, rooted in the Establishment Clause, is irrelevant to the issue of whether the CSP violates section 7.

¶ 47 Furthermore, *Zelman* is factually distinguishable. To begin with, unlike the CSP, the Ohio program allowed students to attend public schools as well as private schools. *Zelman,* 536 U.S. at 645, 122 S.Ct. 2460. More importantly, the Ohio program forbade participating private schools from discriminating on the basis of religion. *Id.* Not only does the CSP fail to prohibit this form of discrimination—it actively permits Private School Partners to engage in it.

¶ 48 *Colorado Christian* is even less germane. In that case, the Tenth Circuit considered the legality of Colorado's scholarship programs—including the very grant program at issue in *Americans United*—and struck them down as violative of the First Amendment for two reasons. 534 F.3d at 1250, 1263. First, the court held that the programs' exclusion of "pervasively sectarian" institutions constituted religious discrimination. *Id.* at 1258, 1260. This holding is simply inconsequential to the legality of the CSP, which does not distinguish among religious schools. If anything, this conclusion merely erodes the strength of *Americans*

*United,* as it invalidates the same program that *Americans United* upheld.

¶ 49 Second, the Tenth Circuit held that the statutory inquiry into whether a university qualified as "pervasively sectarian" involved impermissibly "intrusive judgments regarding contested questions of religious belief or practice." *Id.* at 1261. In particular, the Tenth Circuit noted that courts may not "troll[ ] through a person's or institution's religious beliefs." *Id.* (quoting *Mitchell v. Helms,* 530 U.S. 793, 828, 120 S.Ct. 2530, 147 L.Ed.2d 660 (2000) (plurality opinion) (describing the inquiry into whether a school is "pervasively sectarian" to be "not only unnecessary but also offensive")). Respondents contend that the trial court engaged in such improper conduct when it found as a factual matter that sixteen Private School Partners are religious.

¶ 50 Had the trial court actually conducted such an invasive inquiry, Respondents' argument might carry force. Yet the trial court did not "troll through" the beliefs of any institution. Rather, it simply took notice of the Private School Partners' basic characteristics. For example, the trial court cited various schools' ownership structures (many are formally controlled by churches or dioceses), their admissions policies (several only admit students of a particular faith), and their formal mission statements, all of which school officials corroborated when testifying at the injunction hearing. In conducting this cursory examination, the trial court reached the self-evident and undisputed conclusion that certain Private School Partners are in fact religious.[22] We recognize that a court may not trespass into the depths an institution's religious beliefs. But there is a categorical difference between inquiring into the *extent* of an institution's religiosity and de-

---

21. For their part, Petitioners contend that *Locke* demonstrates the patent invalidity of the CSP. But this too is incorrect. *Locke* held that a state scholarship program that *excluded* students who were pursuing a degree in devotional theology did not violate the First Amendment. 540 U.S. at 715, 124 S.Ct. 1307. It said nothing about the constitutionality of a program that *allowed* stu-

dents to attend religious schools. Thus, *Locke's* facts are inverted from those of the present case.

22. Indeed, the very *name* of fifteen of the sixteen religious Private School Partners features a word—such as "Catholic," "Christian," "Hillel," "Jesuit," or "Lutheran"—that clearly announces the school's religious affiliation.

termining its *existence.*[23] To suggest that the trial court here could not even acknowledge that the CSP resulted in partnerships between the District and religious schools would require the court to be willfully blind to the plain realities—and the corresponding constitutional deficiencies—of the program.

¶ 51 Accordingly, we conclude that both *Zelman* and *Colorado Christian* are inapposite to the present case. Therefore, our decision that the CSP violates section 7 does not encroach upon the First Amendment.

## IV.  Conclusion

¶ 52 Article IX, section 7 of the Colorado Constitution prohibits school districts from aiding religious schools. The CSP has created financial partnerships between the District and religious schools and, in so doing, has facilitated students attending such schools. This constitutes aid to religious institutions as contemplated by section 7. Therefore, we hold that the CSP violates section 7. Accordingly, we reverse the judgment of the court of appeals and remand the case to that court with instructions to return the case to the trial court so that the trial court may reinstate its order permanently enjoining the CSP.

JUSTICE MÁRQUEZ concurs in the judgment.

JUSTICE EID concurs in part and dissents in part, and JUSTICE COATS and JUSTICE BOATRIGHT join in the concurrence in part and dissent in part.

JUSTICE MÁRQUEZ, concurring in the judgment.

¶ 53 I respectfully disagree with the Part II majority[1] that Petitioners lack taxpayer standing to pursue their claim that the Choice Scholarship Program ("CSP") violates the Public School Finance Act of 1994 ("the Act"), §§ 22–54–101 to –135, C.R.S. (2014). It is uncontested that Petitioners have tax-

payer standing to raise their state constitutional challenges. Although the majority acknowledges that Colorado permits "broad taxpayer standing," the majority nevertheless concludes that Petitioners categorically lack taxpayer standing to raise their statutory claims. Maj. op. ¶ 22. Yet I perceive no principled basis in our case law to draw distinctions between a taxpayer's standing to bring a statutory claim as opposed to a constitutional claim. Whether the expenditure allegedly runs afoul of a constitutional or a statutory provision, in the context of *taxpayer* standing the core legal interest at stake is identical: It is the taxpayer's economic interest in ensuring that his tax dollars are expended in a lawful manner.

¶ 54 I would hold that Petitioners have alleged sufficient injury in fact to establish taxpayer standing to challenge the alleged unlawful expenditure of funds under the Act. On the merits, I conclude that the CSP violates the Act by funneling public funds through a nonexistent charter school to finance private education. Because I would resolve this case in favor of Petitioners on statutory grounds, I respectfully concur in the judgment only.

## I.  Taxpayer Standing

¶ 55 Standing is a threshold jurisdictional issue that plaintiffs must satisfy before a court may decide a case on the merits. *Ainscough v. Owens,* 90 P.3d 851, 855 (Colo. 2004). The purpose of the standing analysis is to test a particular litigant's right to raise a legal argument or claim. *City of Greenwood Vill. v. Petitioners for the Proposed City of Centennial,* 3 P.3d 427, 436 (Colo. 2000).

¶ 56 To establish standing under Colorado law, a plaintiff must satisfy two criteria: First, the plaintiff must have suffered an injury in fact, and, second, this harm must have been to a legally protected interest.

---

23.  As Petitioners point out, courts are often *required* to conduct such basic inquiries into the existence of religion. *See, e.g., Maurer v. Young Life,* 779 P.2d 1317, 1331 (Colo.1989) (analyzing an entity's claim that certain properties "qualified for [a tax] exemption *based on use for religious worship and reflection"* (emphasis added)).

1.  A majority of this court holds in Part II that Petitioners lack standing to bring their statutory claim.

*Ainscough,* 90 P.3d at 855 (citing *Wimberly v. Ettenberg,* 194 Colo. 163, 570 P.2d 535, 539 (1977)).

¶ 57 We have characterized the "legally protected interest" requirement as a "prudential rule of standing based on judicial self-restraint." *Conrad v. City & Cnty. of Denver,* 656 P.2d 662, 668 (Colo.1982); *see also Hickenlooper v. Freedom from Religion Found., Inc.,* 2014 CO 77, ¶ 10, 338 P.3d 1002, 1007 (stating that the legally protected interest prong of the standing inquiry "promotes judicial self-restraint"). In describing this prong in *Wimberly,* we referred to a "legally protected interest as contemplated by statutory or constitutional provisions." 570 P.2d at 539. Thus, a "legally protected interest" may be a tangible or intangible interest that rests in property, arises out of contract, lies in tort, or is conferred by constitutional or statutory provisions. *See Barber v. Ritter,* 196 P.3d 238, 246 (Colo.2008).

¶ 58 Yet where a plaintiff asserts *taxpayer* standing, the interest at stake is anchored in his status as a *taxpayer.* Because the taxpayer has (by definition) paid taxes that flow into a pool of public funds, the taxpayer has an "economic interest in having his tax dollars spent in a [lawful] manner." *Conrad,* 656 P.2d at 668. Thus, a taxpayer asserts injury in fact to a legally protected interest when he challenges the allegedly unlawful expenditure of public funds to which he has contributed by his payment of taxes.

¶ 59 In this case, the majority assumes without deciding that Petitioners have alleged an injury in fact, although it never identifies the nature of the injury. Maj. op. ¶ 14. The majority then concludes, however, that under *Allstate Insurance Co. v. Parfrey,* 830 P.2d 905 (Colo.1992), Petitioners' unidentified injury does not implicate any legally protected interest because the General Assembly did not intend to create a private right of action under the Public School Finance Act. Maj. op. ¶¶ 19, 23. But this court's *Parfrey* test was designed to determine "whether a private tort remedy is available against a nongovernmental defendant for violating a statutory duty," and its factors reflect this aim. *See* 830 P.2d at 911. The *Parfrey* test is wholly inapposite in this con-

text. Petitioners are not suing a private party seeking damages for an alleged private wrong; rather, they are taxpayers suing the government seeking declaratory and injunctive relief for the unlawful expenditure of their tax dollars. *See Dodge v. Dep't of Soc. Servs.,* 198 Colo. 379, 600 P.2d 70, 71 (1979). Because the majority uses the wrong test for standing, it reaches the wrong result.

¶ 60 In *Parfrey,* insureds sued their insurer alleging violations of the insurer's statutory duty to offer certain uninsured/underinsured motorist coverage. 830 P.2d at 906. At issue was whether the statute afforded the insured a private civil tort remedy. *Id.* at 910. We held that a statute confers a private remedy against a nongovernmental defendant where three factors are met: (1) the plaintiff is "within the class of persons" intended to benefit from the statute; (2) "the legislature intended to create, albeit implicitly, a private right of action"; and (3) the implied civil remedy would be "consistent with the purposes of the legislative scheme." *Id.* at 911. As the majority recognizes, the aim of the *Parfrey* test is to discover and give effect to the will of the legislature—the *Parfrey* factors "revolve around the touchstone of legislative intent." Maj. op. ¶ 15 n. 9. Thus, whether a plaintiff may sue a private party for damages for a private wrong under a statute turns on whether the legislature intended to allow such recourse as part of the statutory scheme.

¶ 61 However, where a taxpayer seeks to enjoin the government's unlawful expenditure of public funds, we have never demanded a showing that the legislature authorized a private right of action to seek such relief. Rather, for a century, this court has recognized that an individual taxpayer generally may sue to enjoin "the misapplication of public funds from the state treasury." *Leckenby v. Post Printing & Publ'g Co.,* 65 Colo. 443, 176 P. 490, 492 (1918).

¶ 62 All agree that Petitioners have taxpayer standing to assert their claims that the CSP violates certain provisions of the Colorado Constitution. *See* maj. op. ¶ 22 n. 12. After all, Petitioners have asserted an injury in fact—misapplication of public funds—to their legally protected economic interest in

having their tax dollars spent in a lawful manner. *See Hickenlooper*, ¶ 12, 338 P.3d at 1007. But I perceive no principled basis in our case law for the majority to distinguish between taxpayer standing to bring suit to enjoin expenditures of public funds in violation of the Colorado Constitution and taxpayer standing to bring suit to enjoin expenditures of public funds in violation of a statute. *See* maj. op. ¶ 22. The injury to the taxpayers' economic interest in having their tax dollars spent in a lawful manner is identical. The majority reasons simply that the doctrine "typically" applies to alleged "*constitutional* violations" and claims that to recognize Petitioners' standing to enforce the Act would be to "endorse [a] broad and novel conception of taxpayer standing." *Id.* (emphasis in original). But in Colorado, taxpayers have long had the right to bring suit to enjoin the expenditure of public funds in violation of a statute. *See Packard v. Bd. of Cnty. Comm'rs*, 2 Colo. 338, 339, 350 (1874) (recognizing the right of "resident tax payers" "to resort to equity to restrain ... misapplication of public funds" under state statute); *see also Johnson–Olmsted Realty Co. v. City & Cnty. of Denver*, 89 Colo. 250, 1 P.2d 928, 930 (1931) (acknowledging taxpayer's right to sue to enjoin expenditures under a city charter).

¶ 63 More recently, in *Dodge*, we held that individual taxpayers had standing to enjoin the use of public funds for nontherapeutic abortions on grounds that the state lacked statutory authority to do so. 600 P.2d at 71–72. The majority suggests that *Dodge* is distinguishable because the plaintiffs there "did not argue that the government had *violated* a particular statute; rather, they claimed that *no* statute authorized the government's behavior." Maj. op. ¶ 22 n. 13 (emphasis in original). But, for purposes of standing, such a distinction is illusory. An expenditure of public funds may be deemed "unlawful" whether made in violation of an express statutory provision or in the absence of statutory authorization.

¶ 64 In sum, I perceive no principled basis in our case law to limit taxpayer standing to claims based on alleged violations of the constitution. The taxpayer's economic interest in ensuring that his tax dollars are spent in a lawful manner does not somehow change or cease to exist where the expenditure instead runs afoul of a statute (or lacks statutory authorization). The majority's suggestion that to recognize Petitioners' standing to enforce the Act would be to endorse a "novel conception of taxpayer standing," maj. op. ¶ 22, ignores this court's holding in *Dodge* and our earlier case law on which it relied. *See* 600 P.2d at 71 (citing *Johnson–Olmstead*, 1 P.2d 928; *Leckenby*, 176 P. 490; *Packard*, 2 Colo. 338).

## II. Petitioners Have Taxpayer Standing to Challenge Alleged Violations of the Public School Finance Act

¶ 65 I would hold that Petitioners in this case have taxpayer standing to challenge the alleged violations of the Act. Petitioners are nonprofit corporations and individuals: parents of children in Douglas County's public schools, citizens concerned with public education, and, most importantly, Colorado taxpayers. Petitioners contend that the Douglas County School District lacks statutory authority to receive public funds under the Act for public school pupils and to redirect those monies to fund private school education under the auspices of the CSP. In short, Petitioners claim that they are harmed by the diversion of their tax dollars away from public schools and into private schools. Like the taxpayer plaintiffs in *Dodge* and *Johnson–Olmsted*, Petitioners have a cognizable interest in the government's spending their tax money in a lawful manner. *Dodge v. Dep't of Soc. Servs.*, 198 Colo. 379, 600 P.2d 70, 72 (1979); *Johnson–Olmsted Realty Co. v. City & Cnty. of Denver*, 89 Colo. 250, 1 P.2d 928, 930 (1931).

¶ 66 Importantly, Petitioners' alleged economic injury in this case is not merely an "indirect and incidental" harm. *Wimberly v. Ettenberg*, 194 Colo. 163, 570 P.2d 535, 539 (1977). In *Hickenlooper v. Freedom from Religion Foundation, Inc.*, this court held that the de minimis cost of "the paper, harddrive space, postage, and personnel necessary to issue one Colorado Day of Prayer proclamation each year" was not sufficiently related to the plaintiffs' tax contributions to

establish an injury in fact. 2014 CO 77, ¶ 15, 338 P.3d 1002, 1008. Here, by contrast, Petitioners estimate that, based on a projected funding amount of $6100 per pupil for the 2011–2012 school year, the CSP would remove more than $3 million from the Douglas County School District's budget. In fact, by the time the trial court entered its injunction, the CSP had already delivered more than $200,000 in tuition checks to Private School Partners. In my view, these expenditures demonstrate that Plaintiffs have alleged a sufficient injury for taxpayer standing purposes. *Wimberly*, 570 P.2d at 539.

### III. Petitioners' Claim Under the Public School Finance Act

¶ 67 Having determined that Petitioners have taxpayer standing under the Act, I briefly outline my views of the merits of their claim and my conclusion that the CSP is a patently unauthorized use of public funds under the Act.

¶ 68 Petitioners allege that the CSP violates the Act largely for two reasons. First, the Act is designed to distribute public money to each school district to fund public education, and the CSP violates section 22–54–104(1)(a), C.R.S. (2014), by diverting public funds to private schools. Second, the CSP funnels public funds through the Choice Scholarship Charter School—a charter school that exists only on paper and fails to comport with the requirements of the Charter School Act, § 22–30.5–104, C.R.S. (2014). Because I agree that the CSP diverts public funds allocated for public education to private schools and that the nonexistent Charter School functions as no more than a funding conduit to achieve this end, I would grant Petitioners' requested relief.

¶ 69 The Public School Finance Act was "enacted in furtherance of the general assembly's duty under section 2 of article IX of the state constitution to provide for a thorough and uniform system of public schools throughout the state." § 22–54–102(1), C.R.S. (2014). This Act is the means by which Colorado funds its public schools, and the tax money distributed under the Act is explicitly intended for *"public* schools" and *"public* education." *E.g.,* § 22–54–101, C.R.S. (2014) (short title) (emphasis added); § 22–54–102(1) (legislative declaration) (emphasis added); § 22–54–104(1)(a) ("[T]he provisions of this section shall be used to calculate for each district an amount that represents the financial base of support for *public* education in that district.... The district's total program shall be available to the district to fund the costs of providing *public* education ...." (emphasis added)). The Act does not authorize a district to redirect public funds allocated for a student's public school education to finance that student's private school education.

¶ 70 As the majority describes, the District collects per-pupil funding from the State based on its public school pupil enrollment. Maj. op. ¶ 4; § 22–54–104. Under the Act, charter school students are included in the District's "pupil enrollment" for the purposes of per-pupil revenue, *see* § 22–54–124(1)(c), C.R.S. (2014), as long as the charter school "report[s] to the department the number of pupils included in the school district's pupil enrollment ... that are *actually enrolled* in each charter school." § 22–30.5–112(1)(a), C.R.S. (2014) (emphasis added). The CSP funds itself through per-pupil revenue received from the State by counting the CSP students as charter school students "enrolled" in the Choice Scholarship Charter School. Maj. op. ¶ 4. For each scholarship recipient "enrolled" at the Charter School, the District retains 25% of the per-pupil funding amount to cover administrative costs and sends the remaining 75% to the student's chosen Private School Partner in the form of a check that the parent must endorse for the sole purpose of paying tuition at the private school. *Id.* at ¶ 5.

¶ 71 The problem with this arrangement, of course, is that the Choice Scholarship Charter School does not in fact exist. As the trial court found, the Charter School "has no buildings, employs no teachers, requires no supplies or books, and has no curriculum." No CSP student will spend a single day attending classes at this "school." The Choice Scholarship Charter School is an illusion, serving merely as a conduit to collect per-pupil revenue from the state to send students to private schools. Labeling this

private school funding mechanism a "charter school" to collect public funds under the Act does not make it so.

¶ 72 Moreover, the Private School Partners—where the CSP scholarship students are *actually enrolled and educated*—fail to meet multiple requirements of the Charter School Act. Most obviously, charter schools must be public, nonsectarian, and nonreligious, and they must operate within a public school district. § 22–30.5–104(1). Charter schools may not discriminate on the basis of disability, sexual orientation, religion, or need for special education services. § 22–30.5–104(3). And charter schools may not charge tuition. § 22–30.5–104(5).

¶ 73 The Private School Partners are plainly not public schools, and the trial court found that fourteen of the twenty-three Private School Partners are located outside the Douglas County School District. Sixteen are sectarian or religious and teach "sectarian tenets or doctrines" as this term is used in article IX, section 8 of the Colorado Constitution. At least eight discriminate in enrollment or admissions on the basis of religious beliefs or practices. In addition, the trial court found that the CSP permits Private School Partners to discriminate against students with disabilities; that one school has an "AIDS policy" under which it can refuse to admit, or expel, HIV-positive students; and that another participating school lists homosexuality as a "cause for termination" in its teacher contract. Finally, every single one of the CSP's Private School Partners charges tuition.

¶ 74 Respondents argue that section 22–32–122(1), C.R.S. (2014), which allows school districts to contract with private schools and corporations for educational services, and section 22–30.5–104(4)(b), which permits charter schools to contract with education management providers, expressly authorize the Choice Scholarship Charter School to purchase a "complete package of educational services" from the Private School Partners. *See* Answer Br. for Douglas County School District, et al. at 27. However, section 22–32–122(3)(a) explicitly states that any educational service provided under this statute must be "of comparable quality and *meet the*

*same requirements and standards* that would apply if performed by the school district." (Emphasis added.) Article IX, section 8 of the Colorado Constitution prohibits religious instruction in public schools, and therefore the CSP could not contract with private religious schools for a "complete package of educational services." Likewise, although section 22–30.5–104(4)(b) permits charter schools to enter into private contracts, it does not authorize charter schools to violate the requirements of the Charter School Act. *See* § 22–30.5–104(1).

¶ 75 In sum, the CSP violates the Act by collecting per-pupil funding from the State for students "enrolled" in an illusory charter school and redirecting that public money to pay tuition for those students' private education at sectarian and other private schools—including schools located outside the District. Moreover, these Private School Partners receiving public money for "charter school" students fail to meet the statutory requirements of a charter school.

## IV. Conclusion

¶ 76 I would hold that Petitioners have taxpayer standing to pursue their statutory claim. Further, I conclude, as the trial court did, that Petitioners have demonstrated that the CSP violates the Act; thus, Petitioners have a clear and certain right to injunctive relief. I would reverse the judgment of the court of appeals on statutory grounds and would not reach Petitioners' constitutional claims. I therefore respectfully concur in the judgment only.

JUSTICE EID, concurring in part and dissenting in part.

¶ 77 Today, the plurality interprets article IX, section 7 as prohibiting the expenditure of any state funds that might incidentally or indirectly benefit a religious school. This breathtakingly broad interpretation would invalidate not only the Choice Scholarship Program ("CSP"), but numerous other state programs that provide funds to students and their parents who in turn decide to use the funds to attend religious schools in Colorado. The plurality's interpretation barring indirect funding is so broad that it would invalidate

the use of public funds to build roads, bridges, and sidewalks adjacent to such schools, as the schools, in the words of the plurality, "rely on" state-paid infrastructure to operate their institutions. Pl. op. ¶ 28. Because I fundamentally disagree with the plurality's interpretation, I respectfully dissent from Part III of its opinion on the following two grounds.[1]

¶ 78 First, the language of article IX, section 7, does not compel this result. It prohibits a government entity from "mak[ing] any appropriation or pay[ing] from any public fund or moneys whatever ... to help support or sustain any [church or sectarian] school ... whatsoever." It thus invalidates a public expenditure made "to help support or sustain" church or sectarian schools. It does not suggest, as the plurality would have it, that any program that provides public money for other purposes—for example, to assist students—is constitutionally suspect simply because the funds indirectly or incidentally benefit church or sectarian schools. Such a reading is contrary to *Americans United for Separation of Church and State Fund, Inc. v. State*, 648 P.2d 1072, 1083 (Colo.1982), in which we upheld a state grant program similar to the CSP on the ground that "the aid is designed to assist the student, not the institution." Our approach in *Americans United* mirrors long-standing Establishment Clause doctrine, under which a program "of true private choice, in which government aid reaches religious schools only as a result of the genuine and independent choices of private individuals" is "not readily subject to challenge" because the "circuit between government and religion [has been] broken." *Zelman v. Simmons–Harris*, 536 U.S. 639, 652, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002). The plurality not only misinterprets the language of section 7, it mistakenly departs from this fundamental tenet of Establishment Clause jurisprudence.

¶ 79 But a more serious error on the part of the plurality is its steadfast refusal to consider whether section 7 is unenforceable due to possible anti-Catholic bias. The plurality applies what it believes to be (erroneously in my view) the "plain language" of the section. But the plurality cannot sweep the possibility of anti-Catholic bigotry under the plain language rug. The U.S. Supreme Court has made it clear that allegations of such animus must be considered, even where the "plain language" does not invoke religion. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) (rejecting government's contention that constitutional inquiry must end when text does not mention religion, as "facial neutrality is not determinative" of a Free Exercise claim). While a state may choose to, but is not bound to, interpret its own constitutional provisions coextensively with their federal counterparts, the federal constitutional provisions are nonetheless binding on the states. *Americans United*, 648 P.2d at 1078. Here, the plurality has failed to perform its duty to consider whether section 7 is enforceable under the U.S. Constitution before enforcing it against the CSP. For these reasons, I respectfully dissent.

## I.

¶ 80 The plurality first takes a wrong turn in interpreting the language of section 7 as invalidating any government expenditure that indirectly benefits religious schools. That is not what the language of section 7 says.

¶ 81 Section 7 bars a government entity from "mak[ing] any appropriation, or pay[ing] from any public fund or moneys whatever ... to help support or sustain any [church or sectarian] school ... whatsoever." This language bars the expenditure of public funds "to help support or sustain" certain schools. But here, the CSP funds are expended not "to help support or sustain" those schools, but rather to help the student recipients. The language does not suggest, as the plurality believes, that government funds that are directed to a student but happen to have an incidental beneficial effect on certain schools are also forbidden. The

---

1. I join Part II because I agree that the petitioners have no remedy under the Public School Finance Act of 1994, §§ 22–54–101 to –135, C.R.S. (2014), as the Act expressly commits enforcement of its provisions to the Board.

plurality stresses that the language prohibits a government entity from making such an expenditure "whatever" to certain schools "whatsoever." Pl. op. ¶ 27. While these terms reinforce the prohibition on making certain expenditures, they do not modify or expand upon what kind of expenditures are prohibited—that is, expenditures "to support or sustain" a church or sectarian school. In other words, contrary to the plurality's reasoning, these words do not transform the prohibition on expenditures "to support or sustain" certain schools into a prohibition on any expenditures that have the incidental effect of benefiting certain schools.

¶ 82 We elucidated the distinction between direct and indirect assistance in *Americans United,* where we upheld a state grant program that disbursed state grant monies into the school accounts of student grant recipients who attended religious colleges. We first addressed the challengers' Establishment Clause claim, noting that to withstand an Establishment Clause challenge, the program "must be one that neither advances nor inhibits religion." 648 P.2d at 1079 (citing *Lemon v. Kurtzman,* 403 U.S. 602, 614, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971)). At issue in particular was whether the program's "primary effects [were] to advance religion...." *Id.* at 1077. We concluded that the program's "primary effect" was not to advance religion because "[t]he design of the statute [was] to benefit the student, not the institution." *Id.* at 1081.

¶ 83 We returned to this reasoning in considering whether the grant program was consistent with section 7. The challengers claimed that the grant program violated section 7 because it was "an appropriation to help support or sustain schools controlled by churches or sectarian denominations." *Id.* at 1083. Harkening back to our reasoning in the Establishment Clause context, we observed that "as stated previously, the aid [was] designed to assist the student, not the institution." *Id.* Importantly, we recognized that "there is always a possibility that aid in grant form may seep over into the nonsecular functions of an institution," but concluded that "[a]ny benefit to the institution appears to be the unavoidable by-product of

the administrative role relegated to it by the statutory scheme." *Id.* "Such a remote and incidental benefit," we continued "does not constitute, in our view, aid to the institution itself* within the meaning of [a]rticle IX, [s]ection 7." *Id.* at 1083–84 (emphasis added). Thus, under *Americans United,* the focus of the inquiry is whether the funds are expended to help support certain schools or whether they are expended for some other purpose—for example, to assist students, as in that case and here.

¶ 84 The U.S. Supreme Court has recognized this same distinction in its Establishment Clause jurisprudence. In *Zelman,* for example, the Court upheld a program that gave tuition assistance to students from kindergarten to eighth grade in certain districts that could be used to attend any public or private school of their parents' choosing, including religious schools. 536 U.S. at 645, 122 S.Ct. 2460. The Court began by observing that the Establishment Clause prevents states from enacting laws that have the "purpose" or "effect" of advancing or inhibiting religion. *Id.* at 648–49, 122 S.Ct. 2460. There was no dispute that the program had a valid educational (and secular) purpose, and therefore the Court focused on whether it unconstitutionally advanced religion. *Id.* at 649, 122 S.Ct. 2460.

¶ 85 The Court relied upon its "consistent and unbroken" line of precedent holding that aid programs generally do not impermissibly "advance religion" when "government aid reaches religious schools only as a result of the genuine and independent choices of private individuals." *Id.* The Court discussed *Mueller v. Allen,* 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983), where a Minnesota tax deduction program permitted deductions for educational expenses, including for religious schools. *Id.* at 649–50, 122 S.Ct. 2460. The Court rejected an Establishment Clause challenge in that case based on the fact that "public funds were made available to religious schools 'only as a result of numerous, private choices of school-age children.'" *Id.* at 650, 122 S.Ct. 2460 (quoting *Mueller,* 463 U.S. at 399–400, 103 S.Ct. 3062). The Court then pointed to *Witters v. Washington Department of Services for the Blind,*

474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986), which sustained a Washington state vocational scholarship program that provided aid to a student studying to be a pastor based on "identical reasoning"—namely, that any aid that " 'ultimately flows to religious institutions does so only as a result of the genuinely independent and private choices of aid recipients.' " *Id.* (quoting *Witters,* 474 U.S. at 487, 106 S.Ct. 748). Finally, the Court turned to *Zobrest v. Catalina Foothills School District,* 509 U.S. 1, 10, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993), in which it found no Establishment Clause violation where a federal program permitted sign-language interpreters to work with students in religious schools. *Id.* at 651, 122 S.Ct. 2460. Again, no violation occurred because "parents were the ones to select a religious school as the best learning environment for their child," thus severing the link between government and religion. *Id.* at 652, 122 S.Ct. 2460.

¶ 86 Applying this principle to the case before it, the Court concluded that the program was one of "true private choice" and consistent with the Establishment Clause. *Id.* at 653, 122 S.Ct. 2460. Significantly, the Court recognized that there may be "incidental advancement of a religious mission" in these sorts of programs. *Id.* However, such incidental advancement is "reasonably attributable to the individual recipient, not to the government, whose role ends with the disbursement of benefits." *Id.* Moreover, the Court refused to attach constitutional significance to the fact that ninety-six percent of the aid recipients enrolled in religious schools. *Id.* at 658, 122 S.Ct. 2460. According to the Court, "[t]he constitutionality of a neutral educational aid program simply does not turn on whether and why ... most recipients choose to use the aid at a religious school." *Id.* The point is that aid recipients are the ones to make the choice. *Id.* at 662, 122 S.Ct. 2460. *See also Locke v. Davey,* 540 U.S. 712, 719, 124 S.Ct. 1307, 158 L.Ed.2d 1 (2004) (observing that under the Establishment Clause, "the link between government funds and religious training is broken by the independent and private choice of recipients" (citing *Zelman,* 536 U.S. at 652, 122 S.Ct. 2460 (2002))).

¶ 87 The plurality rejects as "irrelevant" this wealth of Supreme Court precedent that reinforces our reasoning in *Americans United,* [2] pointing out that it interprets the federal Establishment Clause, not section 7. Pl. op. ¶ 46. But the plurality's approach is directly contrary to *Americans United,* where, as discussed above, we expressly relied upon our reasoning in considering the Establishment Clause claim in rejecting the section 7 claim. *See* 648 P.2d at 1083 ("[A]s stated previously [with regard to the Establishment Clause], the aid is designed to assist the student, not the institution."). That the aid in question was expended to support students, not the institution, was a critical factor in both our Establishment Clause and section 7 inquiries.

¶ 88 More problematic is the plurality's conclusion that "[b]y its terms, section 7 is far more restrictive than the Establishment Clause regarding governmental aid to religion." Pl. op. ¶ 46. The plurality's mistake is to confuse specificity with restriction. Section 7 is certainly more specific than the Establishment Clause,[3] in that it contains a specific prohibition against making public expenditures "to help support or sustain" certain schools. We made a similar point regarding the specificity of article II, section 4

---

**2.** The plurality also distinguishes *Americans United* and *Zelman* on the facts. Pl. op. ¶¶ 34–43 (*Americans United*); ¶ 47 (*Zelman*). Of course programs will differ from one another in operation. Here, the differences identified by the plurality are plainly distinctions without a difference, as evidenced by the fact that, in the plurality's view, even if the CSP contained the features it identifies from *Americans United,* those features would not render the CSP constitutional. Pl. op. ¶ 38 n.18; ¶ 38 n.19. Moreover, much of what the plurality relies on to distinguish *Americans United* from this case has been rendered unconstitutional by subsequent developments in the law. *See Colo. Christian Univ. v. Weaver,* 534 F.3d 1245, 1269 (10th Cir.2008) (striking down the portion of the state grant program at issue in *Americans United* that precluded aid to "pervasively sectarian" institutions as unconstitutionally discriminatory among religions and as unconstitutionally invasive of religious belief and practice).

**3.** "Congress shall make no law respecting an establishment of religion...." U.S. Const. amend. I.

of the Colorado Constitution—which recognizes the "free exercise and enjoyment of religious profession and worship," as well as that "[n]o person shall be required to attend or support any ministry or place of worship"—in *Americans United*, observing that the state provisions are "considerably more specific than the Establishment Clause of the First Amendment." 648 P.2d at 1081. However, far from casting aside the federal counterpart and its accompanying jurisprudence, we declared that the state provisions should be read "to embody the same values of free exercise and government non-involvement secured by the religious clauses of the First Amendment." *Id.* at 1081–82. We reiterated that "although not necessarily determinative of state constitutional claims, First Amendment jurisprudence cannot be totally divorced from the resolution of these claims." *Id.* at 1078. Here, the Establishment Clause, as interpreted by the Supreme Court, ends up in the same place as the text of section 7—namely, prohibiting expenditures made to assist institutions, but not prohibiting expenditures made to support students.

¶ 89 The plurality acknowledges that "the CSP does not explicitly funnel money directly to religious schools, instead providing financial aid to students." Pl. op. ¶ 28. But it reasons that because "private religious schools *rely on* students' attendance (and their corresponding tuition payments) for their survival, the CSP's *facilitation of such attendance* necessarily constitutes aid to 'support or sustain' those schools." *Id.* (emphasis added). In case there was any doubt, the plurality again emphasizes the breadth of its holding, announcing that because the CSP provides "public money to students who may then use that money to pay for a religious education, [it] aids religious institutions." *Id.*

¶ 90 Under the plurality's interpretation, anything that enables students to attend a religious school "helps support or sustain" that school. This interpretation is so broad that it would easily have swept aside the grant program at issue in *Americans United.* It would also invalidate the programs at issue in *Zelman, Witters, Mueller,* and *Zobrest* described above, all of which facilitated students' attendance because of tuition assistance (*Zelman* and *Witters*), a tax deduction (*Mueller*), or the provision of an interpreter (*Zobrest*). The plurality's breathtakingly broad interpretation of section 7's prohibition would also sweep aside numerous Colorado programs that permit students to use government funds to attend religious schools. For example, the Exceptional Children's Educational Act permits school districts to place students in private "facility" schools, including religious schools, in order to provide them with a "free and appropriate education" under the federal Individuals with Disabilities Education Act. § 22–20–109(1)(a), C.R.S. (2014). Similarly, the Denver Preschool Program allows parents to use public funds to send their children to any licensed preschool, including religious preschools. Denver Mun. Code, ch. 11, art. III, § 11–22(5)(i). Indeed, under the plurality's decision, any program that provides an incidental benefit to certain schools—for example, programs for public infrastructure and safety—will be constitutionally suspect because the schools rely upon the services to operate. *Cf. Freedom from Religion Found. Inc. v. Romer*, 921 P.2d 84, 90 (Colo.App.1996) (discussing an injunction enjoining government officials from permitting public facilities and funds to be used to facilitate papal visit).

¶ 91 The plurality refuses to contemplate the far-reaching implications of its interpretation and instead "chooses to focus [its] analysis solely on the CSP." Pl. op. ¶ 29 n. 15. Yet the plurality's refusal to recognize such implications does not make those implications disappear. In the end, the CSP passes muster under section 7 because it is not an expenditure to help support or sustain certain schools. Instead, it is an expenditure to help support students, who may then choose to use the funds to attend those schools. No one, not even the plurality, disputes this is how the program operates. Pl. op. ¶ 28. I would affirm the court of appeals.

**II.**

¶ 92 A more fundamental problem with the plurality's opinion is that it holds that because section 7 is enforceable on its "plain language," it need not consider whether the

provision is in fact enforceable due to possible anti-Catholic animus.[4] As developed above, I believe the plurality is wrong on the plain language. But even if it were right, it would then be obligated to consider whether the language could be enforced to strike down the CSP. In this case, the plurality simply sticks its head in the sand and hopes that because it cannot see the allegations of anti-Catholic bias, no one else will.

¶ 93 The plurality relies upon *People v. Rodriguez*, 112 P.3d 693, 696 (Colo.2005), for the proposition that constitutional provisions will be enforced " 'as written' whenever their language is 'plain' and their meaning is 'clear.' " Pl. op. ¶ 32. But that statement cannot be taken in a vacuum; indeed, it must be read against the backdrop of federal constitutional law generally, which, under certain circumstances, may require a court to go behind the words of a statute or state constitutional provision. This is one of those circumstances.

¶ 94 The Supreme Court made this point clear in *Lukumi*, 508 U.S. 520, 113 S.Ct. 2217, where it considered a challenge under the Free Exercise Clause[5] to city ordinances that banned the ritual sacrifice of animals. The City argued that the ordinances were neutral on their face and therefore immune from constitutional scrutiny. *Id.* at 534, 113 S.Ct. 2217. The Court rejected this argument, holding instead that "[f]acial neutrality is not determinative" of a Free Exercise claim. *Id.* According to the Court, "[t]he Free Exercise Clause ... extends beyond facial discrimination.... The [Clause] protects against government hostility which is masked, as well as overt." *Id.* The court concluded that "[t]he record in this case compels the conclusion that suppression of the central element of the Santeria worship service was the object of the ordinances." *Id.* Because the ordinances were not neutral, the Court went on to consider whether they were narrowly tailored to advance a compelling state interest. The Court concluded that they were not. *Id.* at 546, 113 S.Ct. 2217.

¶ 95 Under *Lukumi*, the plurality cannot begin and end its analysis with the conclusion that the plain language of section 7 is not discriminatory. In fact, the very case upon which the plurality relies for the proposition that states "may draw a tighter net around the conferral of [government] aid" to religion, pl. op. ¶ 46—*Locke v. Davey*—reinforces *Lukumi's* instruction that courts must look behind the text to discover any religious animus. 540 U.S. at 725, 124 S.Ct. 1307. In *Locke*, which involved a Washington state scholarship program that excluded students pursuing a degree in theology, the Court concluded that "[f]ar from evincing the hostility toward religion which was manifest in *Lukumi*, we believe that the [Washington program] goes a long way toward including religion in its benefits." *Id.* at 724, 124 S.Ct. 1307. The Court upheld the program against a free exercise challenge only after concluding that it could find nothing "that suggests animus toward religion." *Id.* at 725, 124 S.Ct. 1307. The relevant point here is not the Court's conclusion on the matter but that it performed the inquiry in the first place.

¶ 96 Moreover, in this instance, the text of section 7 is not as neutral as the plurality would have it. As noted above, the text bars expenditures "to help support or sustain any school" that is "controlled by any church or sectarian denomination whatsoever." The plurality equates the term "sectarian" with the term "religious," concluding that "the two words are synonymous." Pl. op. ¶ 27. But even *Black's Law Dictionary* 1557 (10th ed. 2014), upon which the plurality relies for its conclusion, does not equate the two terms, suggesting that sectarian relates to "*a particular* religious sect." (emphasis added). In fact, in a 1927 case, this court upheld a school board rule requiring Bible reading in public schools against a section 7 challenge on the

---

4. Because I would uphold the CSP, I, like the majority of the court of appeals, would not need to reach this issue. *Taxpayers for Public Education v. Douglas Cnty. Sch. Dist.*, 2013 COA 20, ¶ 62, —— P.3d ——. But because I disagree with the plurality's treatment of the issue, I address it here.

5. "Congress shall make no law ... prohibiting the free exercise [of religion]." U.S. Const. amend. I.

ground that such activity was not "sectarian"—that is, related to a particular sect. *People ex rel. Vollmar v. Stanley*, 81 Colo. 276, 255 P. 610, 615–16 (1927) (stating that "[s]ectarian meant, to the members of the [Colorado constitutional] convention and to the electors who voted for and against the Constitution, 'pertaining to some one of the various religious sects,' and the purpose of said section 7 was to forestall public support of institutions controlled by such sects."), (overruled by *Conrad v. City & Cnty. of Denver*, 656 P.2d 662 (Colo.1983)). *See also Zelman*, 536 U.S. at 721, 122 S.Ct. 2460 (Breyer, J., dissenting) (stating that public schools were considered "nonsectarian" "which was usually understood to allow Bible reading and other Protestant observances"). In sum, contrary to the plurality's interpretation, the term "sectarian" refers to a particular religious sect, not to religion generally.

¶ 97 In *Mitchell v. Helms*, 530 U.S. 793, 828, 120 S.Ct. 2530, 147 L.Ed.2d 660 (2000), a plurality of the Court referred to the "shameful pedigree" of anti-sectarian sentiment in the 1870's. According to the plurality:

> Opposition to aid to "sectarian" schools acquired prominence in the 1870's with Congress' consideration (and near passage) of the Blaine Amendment, which would have amended the Constitution to bar any aid to sectarian institutions. Consideration of the amendment arose at a time of pervasive hostility to the Catholic Church and to Catholics in general, and it was an open secret that *"sectarian" was code for "Catholic." See generally* Green, *The Blaine Amendment Reconsidered*, 36 Am. J. Legal Hist. 38 (1992) (emphasis added).

*Id.* at 829, 120 S.Ct. 2530. The plurality in this case "decline[s] to ascribe to [*Mitchell* ] the force of law" because it is a plurality opinion. Pl. op. ¶ 44 n.20. But this passage from *Mitchell* is not relevant to this case because it has "the force of law," [6] as the plurality implies; it is relevant for its description of historical context. And while Justice O'Connor, in her separate opinion

concurring in the judgment joined by Justice Breyer, objected to the plurality's reasoning in *Mitchell*, she lodged no objection to the plurality's historical description. 530 U.S. at 837, 120 S.Ct. 2530 (O'Connor, J., concurring in the judgment). In fact, Justice Breyer, joined by Justices Stevens and Souter, recounted the same history in his dissent in *Zelman*. 536 U.S. at 717, 122 S.Ct. 2460 (Breyer, J., dissenting). As Justice Breyer observed, anti-Catholic sentiment "played a significant role in creating a movement that sought to amend several state constitutions (often successfully), and to amend the United States Constitution (unsuccessfully) to make certain that government would not help pay for 'sectarian' (i.e., Catholic) schooling for children." 536 U.S. at 720, 122 S.Ct. 2460 (Breyer, J., dissenting) (emphasis added).

¶ 98 Today's plurality is nothing less than adamant about its refusal to consider the possibility of anti-Catholic animus, accusing intervenor-respondents of injecting into the litigation "little more than a Trojan horse inviting [the court] to rule on the actual legitimacy of section 7." Pl. op. ¶ 30 n. 16. But this is no Trojan horse. The intervenor-respondents presented expert testimony on the question before the trial court. The trial court found the evidence and argument "unpersuasive." The issue was extensively considered by Judge Bernard in his dissent in the court of appeals. *See Taxpayers for Publ. Educ.*, ¶¶ 162–220 (Bernard, J., dissenting). And before this court, echoing Judge Bernard's dissent, petitioners argue that the argument is meritless, not that it should not be considered.

¶ 99 In the end, the plurality's head-in-the-sand approach is a disservice to Colorado, as it allows allegations of anti-Catholic animus to linger unaddressed. The plurality should squarely address the issue of whether section 7 is enforceable, as this court has done with other provisions of the Colorado Constitution. *See, e.g., Colo. Educ. Assoc. v. Rutt*, 184 P.3d 65, 79 (Colo.2008) (interpreting article XXVIII of the Colorado Constitution as enforced against labor organizations consis-

---

6. "While not a binding precedent, [a plurality opinion] should obviously be the point of reference for further discussion of the issue." *Texas*

*v. Brown*, 460 U.S. 730, 737, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983).

tently with First Amendment jurisprudence). Because the plurality fails to do so, and because it misinterprets the text of section 7 and ignores relevant Establishment Clause jurisprudence, I respectfully dissent from its opinion.

I am authorized to state that JUSTICE COATS and JUSTICE BOATRIGHT join in this concurrence in part and dissent in part.